835 So.2d 483 (2002)
Alvin HEBERT, Sr. and Marion M. Dupuis Hebert
v.
ANCO INSULATION, INC., A.P. Green Industries, Inc., Armstrong World Industries, Inc., Asbestos Claims Management Corp., f/k/a National Gypsum Company, Asbestos Corporation, Ltd., A.W. Chesterton Company, The Dow Chemical Company, Mortimer Currier, Charlie Halphen, Lester Poirrier, Harold Hoyle, Theodore Trokelson, James E. Campbell, Joe Bristol, Gerard W. Daigle, Malcolm L. McNabb, V.K. Rowe, Dr. Holder, Dr. Gordon, Don Morris, John Calmes, Al Paradiso, Charlie Melancon, Associates Indemnity Corporation, the American Insurance Company, Travelers Casualty and Surety Company, Flexiallic, Inc., GAF Corporation, The McCarty Corporation, AC & S, Pittsburgh Corning Corporation, Rapid American Corporation T & N, Union Carbide Corporation, and Uniroyal, Inc.
No. 2000 CA 1929.
Court of Appeal of Louisiana, First Circuit.
July 31, 2002.
Rehearing Denied November 5, 2002.
Writs Denied February 21, 2003.
*485 Cameron Waddell, Brian Blackwell, Burton LeBlanc, Baton Rouge, for Plaintiffs/2nd Appellants, Marion D. Hebert, Alvin A. Hebert, Jr., Stanley Robert Hebert, Cindy Hebert Himel, Nancy Hebert Villerette, Catherine Hebert Harrelson and Blake J. Hebert.
H. Alston Johnson, III, Baton Rouge, F. Barry Marionneaux, Plaquemine, John R. Tharp, David Bienvenu, Jr., Gregory E. Bodin, Baton Rouge, for Defendant/1st Appellant, The Dow Chemical Company.
H. Alston Johnson, III, John R. Tharp, David Bienvenu, Jr., Gregory E. Bodin, Baton Rouge, for Defendants/Appellees, Harold Hoyle, Harold Gordon, M.D. and Ben Holder, M.D.
Susan Kohn, New Orleans, for Defendant, McCarty Corporation.
David Barfield, Gaye Nell Currie, Jackson, MS, for Defendant, AC & S, Inc.
Julie Difulco Robles, Metairie, for Defendant, ANCO Insulations, Inc.
A. Wendell Stout, III, New Orleans, for Defendant, United States Gypsum.
Thomas Milazzo, James L. Fletcher, Jr., Metairie, for Defendant, Asbestos Corp., Ltd.
Michael G. Durand, Lafayette, for Defendants, Associates Indemnity Co. & American Insurance Co.
Edward Castaing, Jr., New Orleans, for Defendant, A.W. Chesterton.
Edwin Ellinghausen, III, New Orleans, for Defendant, Pittsburgh Corning Corp.
T. MacDougall Womack, Baton Rouge, for Defendant, Our Lady of the Lake RMC.
Charles Giordano, Metairie, for Defendant, Rapid American Corporation.
John Cosmich, Laura Sanders Brown, Jackson, MS, for Defendants, Owen-Illinois, Inc. & Uniroyal, Inc.
*486 Arthur W. Landry, New Orleans, for Defendant, Synkoloid, A Division of Muralo, Inc.
Darrell Sims, New Orleans, for Defendant, Eagle, Inc.
Janice M. Culotta, New Orleans, for Defendant, Armstrong World Industries, Inc.
Before: GONZALES, WHIPPLE, FITZSIMMONS, KUHN and DOWNING, JJ.
FITZSIMMONS, J.
This case involves claims by Alvin A. Hebert, Sr. and his wife, Marion M. Dupuis Hebert, against The Dow Chemical Company ("Dow") for damages based upon Mr. Hebert's contraction of mesothelioma, a disease resulting from exposure to asbestos-containing products. Following trial, the jury answered interrogatories and found Dow strictly liable. Dow appeals from an amended judgment, which ordered Dow to pay plaintiffs the total sum of $265,625.00 as its virile share of the total damage award. Plaintiffs have also appealed various rulings rendered by the trial court during the course of the proceedings below. We affirm the judgment maintaining the exceptions of lack of personal jurisdiction of various defendants; however, we vacate the "amending judgment" on the merits and remand the case to the trial court with instructions.

FACTS AND PROCEDURAL HISTORY
In February of 1999, Mr. Hebert, a retired millwright, was diagnosed with mesothelioma, cancer of the mesothelia cells that line the outside of the pleural membrane and the lining of the chest wall, for which there is usually no cure. Mr. Hebert and his wife[1] then instituted this suit against numerous defendants, including manufacturers of asbestos-containing products, corporate sellers of such products, owners of premises allegedly defective due to the presence of asbestos-containing products, and certain executive officers of Dow, one of the premises owners sued.[2] In general terms, plaintiffs alleged that the defendant corporations had engaged in the design, manufacture, sale, distribution, and/or installation, handling, storage or transportation of asbestos-containing materials.
Dow was sued as a premises owner based on allegations that Mr. Hebert was exposed to asbestos-containing materials while working as a millwright at Dow's Plaquemine, Louisiana facility from approximately 1956 to 1975, during his employment with Nichols Construction and later with National Maintenance. Additionally, the executive officers of Dow who were named as defendants were sued on the basis that they were negligent in failing to provide Mr. Hebert with a safe place to work.
Prior to trial, defendants Harold Hoyle, Dr. Harold Gordon and Dr. Benjamin Holder, all former employees and alleged executive officers of Dow, filed declinatory exceptions raising the objection of lack of personal jurisdiction. Following argument on the exceptions, the trial court maintained the exceptions and dismissed plaintiffs' claims against these defendants without prejudice. Plaintiffs also settled with *487 numerous defendants, and their claims against various other defendants were dismissed with prejudice on motions for summary judgment. Dow also filed a motion for partial summary judgment, seeking dismissal of Mrs. Hebert's claim for loss of consortium. The court granted the motion, and this claim likewise was dismissed with prejudice.
Thereafter, the matter proceeded to trial against Dow and the McCarty Corporation, the only remaining defendants. Following a two-week trial, the jury returned a verdict, finding that Mr. Hebert had sustained an asbestos-related injury. The jury further found that the McCarty Corporation was not at fault. With regard to Dow, while the jury found that Dow was not negligent, it did find that Dow had custody and control of a defective thing which created an unreasonable risk of harm to which Mr. Hebert had been exposed. The jury made the same finding as to one other company on whose premises Mr. Hebert had worked, Kaiser Aluminum Corporation. Additionally, the jury concluded that six manufacturers with whom plaintiffs had settled prior to trial, Garlock Corporation, Johns-Manville Corporation, Pittsburgh Corning Corporation, Owens-Corning Fiberglas Corporation, Armstrong World Industries, Inc. and Flexitallic Gasket Company, Inc., had introduced into commerce unreasonably dangerous products to which Mr. Hebert had been exposed and that these products were substantial contributing causes of his disease. The jury then awarded Mr. Hebert $2,000,000.00 in general damages and $500,000.00 in past and future medical expenses.
In entering judgment in accordance with the jury verdict, the trial court cast Dow with a one-eighth virile share of the verdict, based on Dow's strict liability and the fault of seven of the settling defendants. Thus, judgment was rendered against Dow in the amount of $312,500.00.
Both Dow and Mr. Hebert filed motions for judgment notwithstanding the verdict. While Mr. Hebert's motion was denied in its entirety, Dow's motion was granted in part, on the issue of the award of medical expenses. The trial court then rendered an amended judgment, reducing the total amount awarded for medical expenses from $500,000.00 to $125,000.00. Thus, the amended judgment cast Dow for damages in the amount of $265,625.00, its virile share of the total amended award, plus interest and costs.
Dow suspensively appealed from the amended judgment on the merits, assigning the following as error:
(1) The trial court erred in its application of strict liability to the facts and circumstances of Mr. Hebert's claim against Dow by failing to direct a verdict in favor of Dow on the strict liability claim and then erroneously instructing the jury on the law of strict liability under La. C.C. art. 2317.
(2) The trial court committed legal error by failing to hold that plaintiffs' settlement with the manufacturers of asbestos-containing products to which Mr. Hebert had been exposed on Dow's premises extinguished Dow's secondary or derivative strict liability as premises owner.
(3) The jury erred in failing to allocate any fault to the settling defendants, BASF and Georgia Pacific, because Mr. Hebert's own admissions established that he was exposed to asbestos-containing products on the premises owned by these settling defendants, plaintiffs' own experts opined that every exposure to asbestos-containing products was a substantial contributing cause of Mr. Hebert's disease, and these settling defendants had care or custody of the same unreasonably dangerous thing *488 that formed the basis of Dow's strict liability.
(4) The jury's general damage award of $2,000,000.00 was excessive as a matter of law.
Thereafter, plaintiffs appealed devolutively from three judgments: the judgment granting the exceptions of lack of personal jurisdiction and dismissing plaintiffs' claims against Gordon, Holder and Hoyle; the judgment granting Dow's motion for partial summary judgment and dismissing Mrs. Hebert's loss of consortium claim; and the amended judgment on the merits. They have set forth the following assignments of error:
(1) The trial court erred in granting the exceptions of lack of personal jurisdiction filed on behalf of defendants, Harold Gordon, Benjamin Holder and Harold Hoyle.
(2) The trial court erred in granting the motion for partial summary judgment filed on behalf of Dow and dismissing Mrs. Hebert's claim for loss of consortium.
(3) The jury erred in failing to find that Dow was negligent in causing Mr. Hebert's mesothelioma.
(4) The jury erred in finding Kaiser Aluminum Corporation, Garlock Corporation, Johns-Manville Corporation, Armstrong World Industries, Inc. and Flexatallic Gasket Company, Inc. at fault in causing Mr. Hebert's mesothelioma.

EXCEPTIONS OF LACK OF PERSONAL JURISDICTION
Defendants, Dr. Harold Gordon, Dr. Benjamin Holder and Harold Hoyle, filed declinatory exceptions raising the objection of lack of personal jurisdiction, which were maintained by the trial court. In their first assignment of error, plaintiffs contend that the trial court erred in maintaining these exceptions. Specifically, plaintiffs aver that these defendants submitted themselves to the exercise of personal jurisdiction over them by filing a motion for summary judgment while their exceptions were still pending, thus waiving the exceptions. Alternatively, plaintiffs contend that these defendants had sufficient minimum contacts with the state to permit a Louisiana court to exercise personal jurisdiction over them. Thus, plaintiffs seek to have the judgment maintaining the exceptions of lack of personal jurisdiction reversed and the matter remanded for trial against these defendants.
Turning first to plaintiffs' contention that Gordon, Holder and Hoyle submitted themselves to the jurisdiction of the court, we find no merit to this argument. A declinatory exception raising the objection of lack of personal jurisdiction must be pleaded either prior to or contemporaneously with the filing of an answer or any other pleading seeking relief other than entry or removal of the name of an attorney as counsel of record, extension of time within which to plead, security for costs or dissolution of an attachment issued on the ground of the nonresidence of the defendant. Otherwise, the objection is waived. La. C.C.P. art. 928A.
In the instant case, these defendants did file their exceptions prior to filing an answer or the subsequently-filed motions for summary judgment. While the filing of the motions for summary judgment constituted a general appearance that would have waived any objections raised by the declinatory exception if these actions had occurred before the personal jurisdiction exception was filed, this general appearance did not waive the pending exceptions of personal jurisdiction. See Bickham v. Sub Sea International, Inc., 617 So.2d 483, 484 (La.1993). As the Louisiana Supreme Court stated in Bickham, "the subsequent general appearance, before trial of the exception, does not constitute waiver of the *489 pending exception." (Emphasis supplied.) Bickham, 617 So.2d at 484. Thus, the subsequent filing by these defendants of motions for summary judgment before trial of their exceptions did not have the effect of waiving their pending exceptions. This argument lacks merit.
We likewise find no merit to plaintiffs' alternative argument that these defendants had sufficient minimum contacts with this state to warrant the exercise of personal jurisdiction over them. Personal jurisdiction is the legal power and authority of the court to render a personal judgment against a party to an action. La. C.C.P. art. 6. Louisiana's long-arm statute imposes personal jurisdiction over non-residents in the following pertinent circumstances:
A. A court may exercise personal jurisdiction over a nonresident, who acts directly or by an agent, as to a cause of action arising from any one of the following activities performed by the nonresident:
(1) Transacting any business in this state.
(2) Contracting to supply services or things in this state.
* * *
(4) Causing injury or damage in this state by an offense or quasi offense committed through an act or omission outside of this state if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in this state.
* * *
B. In addition to the provisions of Subsection A, a court of this state may exercise personal jurisdiction over a nonresident on any basis consistent with the constitution of this state and of the Constitution of the United States.
La.R.S. 13:3201.
The intent of Louisiana's long-arm statute is to procedurally extend personal jurisdiction of the Louisiana courts over nonresidents to comport with the due process clause of the Fourteenth Amendment of the United States Constitution. La. R.S. 13:3201; Jasper v. National Medical Enterprises, Inc., 94-1120, p. 4 (La.App. 1 Cir. 6/23/95), 657 So.2d 604, 607, writ denied, 95-1836 (La.10/27/95), 661 So.2d 1347. The limits of Louisiana's long-arm statute and constitutional due process are, thus, coextensive. Superior Supply Company v. Associated Pipe and Supply Company, 515 So.2d 790, 792 (La.1987). Accordingly, the inquiry into personal jurisdiction over a non-resident involves an analysis of constitutional due process requirements. Superior Supply Company, 515 So.2d 790 at 792.
The landmark case, International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), established the constitutional test for the application of personal jurisdiction to a non-resident. The United States Supreme Court held that personal jurisdiction could be constitutionally imposed if there were "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend `traditional notions of fair play and substantial justice.' ... Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure." International Shoe Co., 326 U.S. at 316, 319, 66 S.Ct. at 158, 160.
Through the years, the United States Supreme Court has broadened its interpretation of "minimum contacts" relative to the ongoing question of specific jurisdiction *490 over an unconsenting out-of-state party to accommodate a changing society. See McGee v. International Life Insurance Company, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); Burger King Corporation v. Rudzewicz, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Nevertheless, the Court has admonished that the "constitutional touchstone remains whether the defendant purposefully established `minimum contacts' in the forum State." Burger King Corporation, 471 U.S. at 474, 485, 105 S.Ct. at 2183, 2189. In this regard, the foreseeability that is critical to due process analysis is that the defendant's action and affiliation with the forum state must be such that he should "reasonably anticipate being haled into court there." Purposeful availment requires that the contacts consist of a deliberate engagement in significant activities within a state, as opposed to a "random," "fortuitous," or "attenuated" relationship with the state seeking personal jurisdiction. Burger King Corporation, 471 U.S. at 474, 475, 480, 486, 105 S.Ct. at 2183, 2186, 2189; Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984).
Further, jurisdiction over individual officers and employees of a corporation may not be predicated merely upon jurisdiction over the corporation itself. However, jurisdiction over the corporation may also confer jurisdiction over the individual officers and employees where they are engaged in activities within the jurisdiction that would subject them to the coverage of the state's long-arm statute. Briley Marine Service, Inc. v. Toups, 551 So.2d 755, 759 (La.App. 1st Cir.), writ denied, 553 So.2d 476 (La.1989); Cobb Industries, Inc. v. Hight, 469 So.2d 1060, 1063-1064 (La. App. 2nd Cir.1985).
Thus, the pivotal question before us remains whether the activities of each of these defendants, Gordon, Holder and Hoyle, taken as a whole, reflect that he purposefully availed himself of the privilege of conducting activities within the state of Louisiana to the extent that he should "reasonably anticipate" litigation in Louisiana. Burger King Corporation, 471 U.S. at 474-475, 105 S.Ct. at 2183.
In the instant case, plaintiffs contend that these executive officers of Dow clearly had enough contact with Louisiana to support the exercise of personal jurisdiction. They contend that these defendants carried on activities in Louisiana, acted as consultants to the Louisiana Division of Dow, and committed acts of omission and commission outside of the state of Louisiana that had deleterious effects on the health of Louisiana residents, including Mr. Hebert, and that the Louisiana court, accordingly, may exercise jurisdiction. We disagree.
The record demonstrates that Dr. Harold Gordon was a resident of Michigan, having resided there for the last seventy-five years. He never resided in Louisiana and never owned any property in Louisiana. He began working for Dow in 1946 as plant physician at Dow's Midland, Michigan facility. He eventually became assistant medical director in approximately 1956, and was then promoted to the position of medical director in 1967, a position he maintained until his retirement in 1977.
As an employee of Dow, Dr. Gordon never maintained an office within the Louisiana Division of Dow and was never stationed at the Louisiana Division. He visited Louisiana only four to six times during his thirty-one-year career with Dow and never treated a patient in the state of Louisiana. Even as medical director, Dr. Gordon never had any authority over the Louisiana Division of Dow to require it to comply with any medical requirements or to implement any health and safety plan. *491 Rather, each division of Dow retained responsibility for its own medical program.
Dr. Benjamin Holder, who resided in Florida at the time of the trial, also never resided in Louisiana. In 1953, Dr. Holder began working for Dow as a staff physician responsible for general patient care and evaluation in Midland, Michigan. He held various positions with Dow's Michigan plant through the 1960s and 1970s.
Eventually, Dr. Holder became the medical director for Dow's United States operations in 1979, and he held that position until he became the global coordinator of occupational health in 1981. The following year, Dr. Holder became the corporate medical director, and he held that position until he retired in 1985. However, by the time Dr. Holder assumed a position extending beyond the Midland, Michigan plant, Mr. Hebert was no longer working at Dow's Plaquemine facility.
Moreover, while Dr. Holder acknowledged that he had come to Louisiana "quite a few times" during his career with Dow, he explained that his role was that of a consultant. He stated that as the United States Area Medical Director, he had no direct responsibility over the medical program of any division of Dow. Rather, his only responsibility was to make himself available for support and consultation. He further stated that he had never received any inquiries from the Louisiana division regarding asbestos.
Harold Hoyle similarly never resided in Louisiana, nor did he ever hold an employment position within the Louisiana Division of Dow. Rather, Hoyle resided in Midland, Michigan. Hoyle began working for Dow in 1941 as an estimator for the pipe shop at its Midland, Michigan facility. He eventually became the safety engineer at the Midland facility in 1944. Thereafter, in 1948, Hoyle became Dow's first full-time industrial hygienist and was assigned the responsibility of creating an industrial hygiene department for the company. He explained that at that time, "the company" was comprised of the Midland operations, a Texas division and a recently-acquired company in California that eventually became the Great Western Division of Dow.
Hoyle only visited the Louisiana division of Dow on a few occasions during his employment with Dow. He further stated that although he was Dow's top industrial hygienist from 1948 until 1975, certain divisions of Dow, including the Louisiana Division, hired their own industrial hygienists, over whom he had no direct responsibility. Additionally, Hoyle testified that he never had any authority over maintenance contractors or their employees, such as Mr. Hebert, at Dow's Plaquemine facility. His responsibility was to furnish information and assistance as an internal consultant to divisional industrial hygienists.
Given these facts and considering the record as a whole, we find no error in the trial court's conclusion that there were insufficient contacts with this state to satisfy due process and to properly assert personal jurisdiction over Gordon, Holder or Hoyle. Their contacts with Louisiana do not amount to a course of conduct that would make them amenable to Louisiana's jurisdiction. We do not find that the quantity, quality or nature of the contacts of these individuals with Louisiana make it fair and reasonable to subject them to suit in Louisiana based on the facts of this case. See Briley Marine Service, Inc., 551 So.2d at 759-760. Accordingly, we find no merit to this assignment of error.

EXTINGUISHMENT OF CLAIMS AGAINST DOW BY PRIOR SETTLEMENTS
In this assignment of error, Dow argues that because its liability to plaintiffs herein *492 was based solely on the finding that it had custody or control of a defective thing, the liability of Dow is properly viewed as secondary or derivative to the manufacturers' liability. As such, Dow contends that it did not owe plaintiffs a separate virile share where the manufacturers who actually created the hazard have been released by plaintiffs. According to Dow, the only portion of the debt for which it could have been liable has been fully satisfied by plaintiffs' settlements with the manufacturing defendants found to be at fault by the jury. Thus, it contends, any debt it may have owed was extinguished.
In response to this argument, plaintiffs assert that Dow failed to affirmatively plead the defense of extinguishment of the debt, and, accordingly, it is precluded from arguing this defense on appeal. We agree.
The defendant is required to affirmatively set forth in his answer any matter constituting an affirmative defense upon which he will rely. La. C.C.P. art. 1005. An affirmative defense raises a new matter which, assuming the allegations in the petition to be true, constitutes a defense to the action and will have the effect of defeating plaintiff's demand on its merits. Johnson v. Steele, 98-1726, p. 5 (La. App. 1 Cir. 9/24/99), 754 So.2d 1006, 1009.
The purpose of the requirement that certain defenses be affirmatively pled is to give the plaintiff fair and adequate notice of the nature of the defense and, thereby, prevent last minute surprise to the plaintiff. Johnson, 98-1726 at p. 5, 754 So.2d at 1009. The policy behind the requirement that affirmative defenses be raised in answer is sensible and laudable. Because affirmative defenses raise matters for judicial resolution outside of issues raised by plaintiff's petition, plaintiff must be made aware of these matters so that plaintiff can prepare an opposition to the defense and adjust his case, if necessary, in light of the new facts and issues raised by the affirmative defense. Patterson v. State, 95-1668, pp. 8-9 (La.App. 3 Cir. 12/11/96), 685 So.2d 473, 478.
A defense that liability has been extinguished, discharged or released by the plaintiff's settlement with, and/or release of, a solidary obligor is an affirmative defense that must be specifically pled. La. C.C.P. art. 1005. In the instant case, Dow did not move to amend its answer to assert the affirmative defense of extinguishment of debt upon plaintiffs' settling with various manufacturing defendants. Rather, Dow raised this affirmative defense for the first time after the completion of trial and the rendering of a verdict by the jury, in its motion for judgment notwithstanding the verdict.
While failure to so plead an affirmative defense does not automatically preclude the application of the defense in all cases, the general rule is that pleadings may be enlarged by evidence adduced without objection when such evidence is not pertinent to any other issue raised by the pleadings and, hence, would have been excluded if objected to timely. La. C.C.P. art. 1154; Snearl v. Mercer, 99-1738, 99-1739, pp. 8-9 (La.App. 1 Cir. 2/16/01), 780 So.2d 563, 572. If the evidence were admissible for any other purpose, the pleadings could not be enlarged without the express consent of the opposing party. Id. In the instant case, the evidence regarding fault of the manufacturing defendants and plaintiffs' settlements with those defendants was relevant to the issue of the assessment of liability to those defendants for purposes of determining the number of joint tortfeasors and, consequently, the number of virile shares, which had the effect of reducing Dow's financial exposure herein. See Carroll v. Kilbourne, 525 *493 So.2d 284, 286-287 (La.App. 1st Cir.1988). Accordingly, applying these legal precepts, we are unable to conclude that Dow's pleadings were expanded at trial to include the affirmative defense of extinguishment of the debt. Thus, Dow's untimely assertion of the affirmative defense of extinguishment of the debt in a motion filed after conclusion of the trial and the rendition of a verdict herein precludes Dow from raising this issue on appeal.[3]
In addition to arguing that the plaintiffs' settlements with the manufacturing defendants extinguished any debt it owed to plaintiffs, Dow further contends that the release of any solidary obligor, such as the manufacturing defendants, without a reservation of rights discharges the debt as to the remaining solidary obligors.[4] The settlement documents, whereby plaintiffs settled with the manufacturing defendants, were excluded from this record, and Dow contends that plaintiffs have failed to prove that they reserved their rights to proceed against Dow, as a solidary obligor. The temporal relationship between the facts of this case and the controlling civil code articles results in a meritorious claim by Dow for the following reasons.
Acts 1979, NO. 431 amended La. C.C. arts. 2323, 2324, 2103 and La. C.C.P. arts. 1811 and 1917 (related generally to comparative negligence).[5] Ushered in with the introduction of comparative negligence in 1979, was a concomitant amendment to La. C.C. art. 2103, which provided that the obligation "shall be divided in proportion to each debtor's fault." The last paragraph in the amendment to article 2103 expressly limited the amendment's application as follows: "The provisions of this act shall not apply to claims arising from events that occurred prior to the time this act becomes effective."
In 1985, La. C.C. art. 2103 was replaced *494 by La. C.C. arts. 1803 and 1804.[6] Louisiana Civil Code article 1803 states: "Remission of debt by the obligee in favor of one obligor, or a transaction or compromise between the obligee and one obligor, benefits the other solidary obligors in the amount of the portion of that obligor." Article 1804 provides for an offense or quasi-offense that "a virile portion is proportionate to the fault of each obligor."
In Cole v. Celotex Corporation, 599 So.2d 1058 (La.1992), the Louisiana Supreme Court concluded that Act 431 of 1979 applied prospectively. The court concluded that: "when the tortious exposures occurring before Act 431's effective date are significant and such exposures later result in the manifestation of damages, pre-Act law applies." Cole v. Celotex, 599 So.2d at 1066. Employing analogous reasoning, this court has concluded that the pre-Act rules of contribution apply among the defendants.
At the same time that La. C.C. arts. 1803 and 1804 were enacted by the legislature to replace La. C.C. art. 2103, another code article relevant to this case, La. C.C. art. 2203, was coextensively abolished. Until 1985, article 2203 had required an express reservation of rights against other solidary obligors when an obligee entered into a compromise.[7] Utilizing the same precepts employed in, and following, Cole v. Celotex, the pre-Act provisions of La. C.C. art 2203 should equally apply to this issue that affects damages among the alleged tortfeasors. Stated alternatively, in the same way that pre-Act law applies relative to contribution, so too does pre-Act law apply to the requirement that a settling party reserve his or her rights against other solidary obligors pursuant to La. C.C. art. 2203. See also Carona v. State Farm Insurance Company, 458 So.2d 1275, 1278 (La.1984).
Following oral argument addressing Dow's subpoena duces tecum of the settlement documents involving the manufacturers and plaintiffs' motion to quash same, the trial court pronounced that the settlement documents would be produced for an in-camera inspection. The court, however, failed to thereafter indicate whether, in fact, the inspection had transpired and whether the settlement documents contained the requisite reservation of rights by plaintiffs necessary to preserve their claim against Dow. Given the court's action vis-ā-vis the subpoena duces tecum, it became the responsibility of the court to conduct the inspection and to pronounce its conclusion. The court's failure to render a determination of this critical issue that had been expressly sought by Dow impacts a core issue of the viability of plaintiffs' claims against Dow.
The trial court's error necessitates the vacating of the judgment on the merits and a remand of the case to the trial court for a determination of the unresolved issue of whether the plaintiffs indeed reserved their rights against Dow when they settled with the manufacturing solidary obligors pursuant to La. C.C. art. 2203. It is, furthermore, ordered that the trial court issue an order that the settlement documents of the released solidary obligors at issue be placed into the court record. Resolution of the remaining issues on appeal is held in abeyance pending the outcome *495 of this court's remand. All costs associated with this appeal are assessed such that appellants and appellees shall each incur one-half of the costs.
AFFIRMED IN PART; VACATED AND REMANDED WITH INSTRUCTIONS.
WHIPPLE, J., concurs in part and dissents in part for reasons assigned.
DOWNING, J., concurs in part and dissents in part for the reasons assigned by WHIPPLE, J.
WHIPPLE, J., concurring in part and dissenting in part.
Since this case was initially submitted, I have agreed with the analysis now adopted by the majority on the issues of personal jurisdiction and failure to affirmatively plead the affirmative defense of extinguishment of debt due to the alleged secondary or derivative nature of Dow's liability. However, I respectfully dissent from the majority's decision to vacate the trial court's judgment in this matter and to remand for a determination of whether plaintiffs reserved their rights against Dow when they settled with other solidary obligors.
Although the record contains ample evidence for this court to conduct its review, the majority bypasses resolution of the merits of this appeal, in this voluminous case tried to finality before a jury, on the basis of a perceived defect in the record. In my view, this type of judicial overreaching frustrates, rather than furthers, the interests of justice and undermines the confidence of the public and the profession in the sanctity of a jury verdict.
Failure to articulate a ruling on the record is not the equivalent of failure to rule. Indeed, many discussions and rulings occur off the record in hotly-contested and protracted litigation, as most certainly occurred in the instant case. For a litigant to make a demand for relief at trial, obtain an in camera inspection in connection with the demand and then stand mute for the remainder of the proceedings when the trial court has obviously denied the demand by failing to grant the requested relief after the in camera inspection does not constitute, in my view, clear error by a trial court as would justify later setting aside a verdict on the merits.
It is well established that silence in a court's judgment or ruling with respect to any urged claim or demand constitutes rejection of the claim or demand, and the trial court is not required to articulate its rejection on the record for its rejection to have legal effect.
The record and exhibits in this matter are in excess 3,648 pages. The verdict rendered in this case was the culmination of lengthy and protracted proceedings over a number of years, involving multiple parties, issues and evidentiary rulings by the trial court in the course of a two-week trial. All parties were amply represented by experienced counsel and fully participated in the trial. While the trial court did not provide specific reasons for denying Dow's claim that no reservation of rights had occurred, notably absent from the record of this two-week trial is any objection by Dow raising or addressing the trial court's alleged failure to rule or to specifically articulate its ruling.
With regard to this issue of the alleged lack of a reservation of rights, Dow contends that the release of any solidary obligor, such as the manufacturing defendants, without a reservation of rights discharges the debt as to the remaining solidary obligors.[1] Although the settlement documents, *496 whereby plaintiffs settled with the manufacturing defendants, are not a part of this record, Dow now contends that plaintiffs have failed to prove that they reserved their rights to proceed against Dow, as a solidary obligor.
Former LSA-C.C. art. 2203, upon which Dow relies, provided:
The remission or conventional discharge in favor of one of the codebtors in solido, discharges all the others, unless the creditor has expressly reserved his right against the latter.
In the latter case, he can not claim the debt without making a deduction of the part of him to whom he has made the remission.
Plaintiffs, on the other hand, argue that former LSA-C.C. art. 2203 does not apply herein, because the settlements at issue were confected after new article 1803 was added, which deleted the reservation of rights requirement. As part of the general revision of the law of obligations in the Civil Code by Acts 1984, No. 331, the Legislature changed the law which had previously required an express reservation of rights when an obligee entered into a compromise with one of several solidary obligors. Under LSA-C.C. Art. 1803, effective January 1, 1985, the remission of the debt by the obligee in favor of one obligor or the compromise between the obligee and one obligor does not extinguish an obligation which is solidary, but only benefits the other solidary obligors to the extent of the portion of the released obligor. Weber v. Charity Hospital of Louisiana at New Orleans, 475 So.2d 1047, 1052 (La.1985).
In Lee v. Missouri Pacific Railroad Company, 540 So.2d 287, 294 (La.1989), the Louisiana Supreme Court held that a settlement that was confected after the effective date of LSA-C.C. art. 1803 was governed by this new article. In Lee, as in the present case, the cause of action arose before the effective date of LSA-C.C. art. 1803, but the settlement occurred after its enactment. Accordingly, I would conclude that under the dictates of Lee, the settlements entered into in the present case would likewise be governed by LSA-C.C. art. 1803, which has no requirement of a reservation of rights against the remaining solidary obligors.
I do note that in the earlier case of Carona v. State Farm Insurance Company, 458 So.2d 1275, 1278 (La.1984), the Louisiana Supreme Court, in discussing the reservation of rights issue, held that "[n]ew article 1803 does not apply to the present cases which arose before its effective date." However, it is unclear from the facts of that case whether the settlements had also been confected prior to the effective date of LSA-C.C. art. 1803. Accordingly, absent a ruling from the Supreme Court overruling its later holding in Lee, I would find that this court is bound to apply Lee, which contains a specific pronouncement as to the applicability of LSA-C.C. art. 1803 under facts parallel to those presented herein, rather than this court being at its leisure to analogize to the pronouncements of Cole v. Celotex, 599 So.2d 1058 (La.1992), regarding the retroactivity of the comparative fault articles. Thus, I would conclude that no reservation of rights was required in the settlement documents.
Moreover, even assuming that former LSA-C.C. art. 2203 applies herein, I find no merit to Dow's assertion that this court should find that plaintiffs' claims against it *497 were extinguished by a failure to reserve their rights against Dow. While Dow argues that plaintiffs' claims against it are extinguished based upon the absence of evidence that plaintiffs reserved their rights to proceed against Dow in the settlement documents, as the party asserting the affirmative defense of discharge or extinguishment of the debt, Dow had the burden of proving its claim. See Frazier v. Freeman, 481 So.2d 184 (La.App. 1st Cir.1985); see also American Bank v. Saxena, 553 So.2d 836, 844 (La.1989); Buck's Run Enterprises, Inc. v. Mapp Construction, Inc., XXXX-XXXX, p. 4 (La.App. 1st Cir.2/16/01), 808 So.2d 428, 431.
Additionally, although Dow contends that plaintiffs never produced the settlement documents herein, I note that on the morning of trial, plaintiffs' counsel informed the court that he had been served by Dow that morning with a subpoena duces tecum, requesting that plaintiffs produce the settlement documents evidencing their settlements with various defendants. In response to the subpoena, plaintiffs orally moved to quash the subpoena, arguing that plaintiffs' actions in providing Dow with a list of the names of the settling defendants were sufficient.
In response to plaintiffs' motion to quash, Dow specifically argued to the court that prior to 1983, the law of solidary obligors provided that release of one solidary obligor without a specific reservation of rights to proceed against the remaining solidary obligors acts as a release of the remaining non-settling solidary obligors. Thus, Dow contended that plaintiffs should be required to produce a copy of the settlement documents to determine if, in fact, they contained a specific reservation of rights by plaintiffs. In response, plaintiffs agreed to produce the documents to the trial court for an in-camera review to determine whether there had been any possible release.
The trial court denied plaintiffs' motion to quash the subpoena duces tecum, but granted the alternative action of ordering that the settlement documents "be produced in-camera." As the parties note, these documents do not appear in the record. However, as stated above, the record is devoid of any objection by Dow at trial to either the trial court's failure to conduct the inspection or any ruling allegedly predicated thereupon. However, even assuming arguendo that this alleged failure or error by the trial court was preserved for appellate review, Dow has not established that it was deprived of the ability to establish a defense by any failure on the part of plaintiffs.[2] Accordingly, on review, I find no basis for overturning the jury verdict on this alleged record deficiency.
In its brief to this court filed after argument of the case before the five-judge panel,[3] Dow further asserts that plaintiffs' objection to producing the settlement agreements and filing a motion to quash creates an adverse inference that the requested documents would have been unfavorable to plaintiffs' position. See Munson v. Munson, 2000-348, p. 9 (La.App. 3rd Cir.10/4/00), 772 So.2d 141, 147. Additionally, citing Boh Brothers Construction Company, Inc. v. Luber-Finer, Inc., 612 So.2d 270, 274 (La.App. 4th Cir.1992), writ *498 denied, 614 So.2d 1256 (La.1993), Dow argues that when a litigant fails to produce available evidence and no reasonable explanation is made, there is a presumption that such evidence would be unfavorable. In effect, Dow suggests that this court should recognize a presumption in its favor that the settlement documents did not contain a reservation of rights because plaintiffs opposed Dow's request for production of these documents with no reasonable explanation.
However, I note that at trial, in support of their opposition to production of the settlement documents, plaintiffs offered the explanation that they had entered into confidentiality agreements with the settling defendants. More importantly, as noted above, the trial court herein ordered production of the documents for an in camera inspection. Thus, under these facts, I believe that an adverse inference or presumption that the evidence would be unfavorable is simply not warranted.
Accordingly, given the absence of evidence in the record to establish that plaintiffs failed to reserve their rights to proceed against Dow in the settlement documents, I would conclude that Dow did not preserve this claim for review, and further, that Dow has failed to carry its burden of proving that the debt to plaintiffs was extinguished on this basis. See Frazier, 481 So.2d at 186. Thus, I respectfully disagree with the majority's decision to vacate the judgment in favor of plaintiffs, and I would urge that any ultimate appeal be resolved on the merits of the remaining issues as follows.

ACCURACY AND ADEQUACY OF JURY INSTRUCTIONS

(Dow's Assignment of Error Number 1)
In this assignment of error, Dow contends that the instructions regarding strict liability read to the jury herein were incomplete and failed to convey the law of this state. Dow further contends that this inadequate jury instruction tainted the jury's fact-finding process, and, accordingly, this court should conduct a de novo review of the record on the issue of strict liability.
The trial court is required to instruct the jurors on the law applicable to the cause submitted to them pursuant to LSA-C.C.P. art. 1792(B). In a jury trial, the judge has a duty to charge the jury as to the law applicable in a case and the correlative right and responsibility to require that the jury get only the correct law. Belle Pass Terminal, Inc. v. Jolin, Inc., 92-1544, p. 35 (La.App. 1st Cir.3/11/94), 634 So.2d 466, 488, writ denied, 94-0906 (La.6/17/94), 638 So.2d 1094.
The judge is not required to give the precise instruction submitted by either party, but must give instructions which properly reflect the law applicable in light of the facts of the particular case. Adequate instructions are those instructions which fairly and reasonably point up the issues presented by the pleadings and evidence and which provide correct principles of law for the jury's application thereto. McCrea v. Petroleum, Inc., 96-1962, p. 7 (La.App. 1st Cir.12/29/97), 705 So.2d 787, 791.
The adequacy of jury instructions must be determined in light of the jury instructions as a whole. Johnson v. Terrebonne Parish Sheriff's Office, 95-1180, p. 7 (La. App. 1st Cir.2/23/96), 669 So.2d 577, 582, writ denied, 96-0727 (La.4/26/96), 672 So.2d 907. Whether or not to include a requested jury instruction is a matter within the wide discretion of the trial court and the court's decision will not be overturned absent abuse of that discretion. Gardner v. Griffin, 97-379, p. 4 (La.App. 1st Cir.4/8/98), 712 So.2d 583, 586.
*499 An appellate court must exercise great restraint before overturning a jury verdict on the suggestion that the instructions were so erroneous as to be prejudicial. The standard of review required of this court in determining whether an erroneous jury instruction has been given requires a comparison of the degree of error with the jury instructions as a whole and the circumstances of the case. Boncosky Services, Inc. v. Lampo, 98-2239, pp. 9-10 (La.App. 1st Cir.11/5/99), 751 So.2d 278, 285, writ denied, XXXX-XXXX (La.3/24/00), 758 So.2d 798.
In the instant case, the trial court gave the following instruction to the jury on the law of strict liability:
A premises owner has a duty to keep its property in a reasonably safe condition, including a duty to discover any defects on its property and either correct them or warn potential victims.
Under strict liability, the mere fact of the owner's relationship with and responsibility for the damage-causing thing gives rise to an absolute duty to discover the risks presented by the thing in custody. To find the premises owner strictly liable, the Plaintiff need only prove that the defendant had custody of the premises or custody of the thing that was defective or unreasonably dangerous; and that the defect was a substantial contributing factor to Plaintiff's injury. Fault of a third person is a defense to this cause of action.
Dow objected to this jury charge in the trial court. Specifically, Dow's complaints are that the jury instruction was inadequate in that it failed to define the terms "unreasonably dangerous" and "defective" and it did not set forth Dow's requested charge on the "risk utility test" for determining unreasonable danger. Plaintiffs, on the other hand, contend that the additional charges requested by Dow constitute an analysis of duty, a question of law. Accordingly, they contend that Dow's proposed charge was not a proper question for the jury.
On review, I would conclude that the jury instruction given by the trial court was an accurate statement of the law applicable to plaintiffs' claims. See Kent v. Gulf States Utilities Company, 418 So.2d 493, 497 (La.1982). Moreover, reviewing the jury instructions in their entirety, I would find that the instructions given were adequate, and I am unable to say that the trial court abused its discretion in declining to give the additional instructions requested by Dow.
The trial court may have chosen not to expound on the law of strict liability beyond the instructions included in the charge to reduce the possibility of confusing the jury. Moreover, the court may have limited an expansive discussion of the law on strict liability in light of the pleadings and facts of this case. See Belle Pass Terminal, Inc., 92-1544 at pp. 38-39, 634 So.2d at 490. Given the facts to be determined and the issues to be resolved by the jury, I find no abuse of discretion. Accordingly, I find no merit to Dow's assertion that the trial court's failure to specifically charge the jury using the additional language of the cases it relied upon rendered the jury verdict invalid.

STRICT LIABILITY OF DOW

(Dow's Assignment of Error Number 1)

Third-Party Fault Defense
Dow further argues that the trial court erred in failing to render judgment in its favor on the issue of strict liability, in accordance with the jury's answers to specific interrogatories, finding the manufacturers of the asbestos-containing products to be at fault. Dow argues that it could *500 not have been held strictly liable, because the jury's findings of third-party fault by six of the manufacturing defendants operates as a defense to this claim and bars a finding of strict liability on the part of Dow.
Louisiana Civil Code article 2317[4] imposes liability upon the custodian of a defective thing which creates an unreasonable risk of harm to others. In Loescher v. Parr, 324 So.2d 441, 447-448 (La.1975), the Louisiana Supreme Court held that in order for a plaintiff to recover in strict liability from the owner or custodian of the allegedly defective thing, the plaintiff must prove the vice (i.e., the unreasonable risk of injury to another) in the thing causing the damage and that the damage resulted from this vice.
The resulting liability is strict in the sense that the owner's duty to protect against injurious consequences resulting from the risk does not depend on actual or constructive knowledge of the risk. Under strict liability, the mere fact of the owner's relationship with and responsibility for the damage-causing thing gives rise to an absolute duty to discover the risks presented by the thing in custody. Kent v. Gulf States Utilities Co., 418 So.2d at 497.
Nonetheless, a strictly liable defendant may be absolved of fault "only if he shows the harm was caused by the fault of the victim, by the fault of a third person, or by an irresistible force." Loescher, 324 So.2d at 447. With regard to the defense of third-party fault, the Supreme Court has specifically defined the fault of a third person which exonerates a premises owner from its own strict liability as that which is the "sole cause" of the damage. Olsen v. Shell Oil Company, 365 So.2d 1285, 1293 (La.1978) (emphasis added). In explaining the defense of third-party fault, the Court stated as follows:
The fault of a "third person" which exonerates a person from his own obligation importing strict liability as imposed by Articles 2317, 2321, and 2322 is that which is the sole cause of the damage, of the nature of an irresistible and unforeseeable occurrence i.e., where the damage resulting has no causal relationship whatsoever to the fault of the owner in failing to keep his building in repair, and where the "third person" is a stranger rather than a person acting with the consent of the owner in the performance of the owner's non-delegable duty to keep his building in repair. (Footnote omitted).
Olsen, 365 So.2d at 1293-1294. The Court further instructed that the owner or custodian of a defective building or thing is not relieved of his responsibility and strict liability to the victim unless the intervening third person's act or fault is in the nature of a superseding cause in Anglo-American tort law. Olsen, 365 So.2d at 1293 n. 15.
In interpreting these pronouncements by the Supreme Court, this court has concluded that the "sole cause" to which the Supreme Court referred is the sole "legal" cause or "responsible" cause, as distinguished from a "cause-in-fact." Hessifer v. Southern Equipment, Inc., 416 So.2d 368, 373 (La.App. 1st Cir.1982). The essence of the legal cause inquiry is whether the risk and harm encountered by the plaintiff fall within the scope of protection of the duty imposed. Specifically, it involves a determination of whether the duty imposed was designed, at least in part, to afford protection to the class of claimants *501 of which plaintiff is a member from the harm suffered. Roberts v. Benoit, 605 So.2d 1032, 1054 (La.1991).
In support of its contention that the third-party fault of the manufacturing defendants relieves it of its strict liability to plaintiffs, Dow relies upon the case of Jowers v. Commercial Union Ins. Co., 435 So.2d 575 (La.App. 3rd Cir.1983). In Jowers, the plaintiff sustained severe concrete burns on his legs while spreading and leveling wet concrete at his parents' home. The plaintiff filed suit against the cement manufacturer and his father's homeowner's insurer. Jowers, 435 So.2d at 576-577. With regard to the manufacturer, the Third Circuit Court of Appeal concluded that the cement manufacturer had knowledge that wet cement or concrete could cause injury to the skin, but failed to warn plaintiff and his father, ordinary "do-it-yourself" home improvers. Thus, the cement manufacturer was deemed liable under both negligence and strict liability principles. Jowers, 435 So.2d at 578-579.
However, with regard to the plaintiff's parents, whom he asserted were strictly liable pursuant to LSA-C.C. art. 2317, the court, with limited analysis, concluded that these homeowners were absolved from strict liability on the basis of the third-party fault of the cement manufacturer. See Jowers, 435 So.2d at 579.
However, I note that in addressing the corresponding fault of a manufacturer and custodian or owner to an injured plaintiff, the Louisiana Supreme Court has specifically held that both the manufacturer and the custodian of a defective thing are strictly liable in solido for any resulting injuries. Brown v. Sears, Roebuck and Company, 514 So.2d 439, 444 (La.1987); Hunt v. City Stores, Inc., 387 So.2d 585, 590 (La.1980); see also Francis v. American Well Service and Drilling, Inc., 617 So.2d 1329, 1332 (La.App. 3rd Cir.1993). In Brown, a child was injured when his left little finger was caught in the space between the moving treads and the side panel of an escalator at a department store. Relying upon LSA-C.C. art. 2317, as interpreted by the Court in Loescher, the Supreme Court concluded that both the manufacturer of the escalator and the custodian were strictly liable in solido. Brown, 514 So.2d at 440, 444. Additionally, with regard to the defense of third-party fault, the Supreme Court instructed as follows:
The court of appeal correctly found that there was no victim or third party fault. Although not unreasonably dangerous "per se," escalators are unreasonably dangerous to small children, making their manufacturers and custodians strictly liable for escalator injuries to those children. LSA-C.C. art. 2317. (Emphasis added).
Brown, 514 So.2d at 445. Thus, the Supreme Court clearly did not view the legal fault of the manufacturer of the defective escalator as the "sole cause" of the damage, of the nature of an irresistible and unforeseeable occurrence or a superseding cause, such that the manufacturer's fault would relieve the custodian of the defective thing of its legal fault on the basis of the defense of third-party fault.
Additionally, in the earlier case of Hunt, another defective escalator case, while the Supreme Court found both the custodian and manufacturer to be at fault, the Court additionally found that the department store, as custodian of the defective escalator, had failed to establish the defense of any fault by a third person which would relieve it of liability.[5]Hunt, 387 So.2d at 589.
*502 In the instant case, Dow was found to be strictly liable as a premises owner, but was also found to be free from negligence. Thus, its liability arose from its relationship with and responsibility for the defective thing, rather than from any finding of active fault on its behalf. Similarly, the manufacturers were found to be strictly liable on the basis that they introduced into commerce unreasonably dangerous products. In strict products liability, the manufacturer is presumed to know of the dangerous propensities of its product, whether or not it has not it has actual knowledge. Weber v. Fidelity & Casualty Insurance Company of New York, 259 La. 599, 602-603, 250 So.2d 754, 755-756 (1971). The jury in this case made no independent finding of knowledge of the defect, i.e., actual fault, on the part of the manufacturing defendants. Rather, as with Dow, the manufacturing defendants' liability was premised on their relationship with and responsibility for the defective thing.
Based on the Supreme Court's pronouncements in Olsen, Hunt and Brown, I would conclude that Dow, as the strictly liable custodian of the defective product or owner of the premises incorporating the defective product, has not proven the defense of third-party fault for the corresponding strict products liability of the manufacturer of the same defective product. In this case, I would further conclude that the manufacturers' legal fault is not the type of superseding cause or the sole legal cause contemplated under the defense of third-party fault.[6] For these reasons, I would find no merit to Dow's contention that the trial court erred in failing to dismiss plaintiffs' strict liability claims against it on the basis of the jury's findings that six manufacturing defendants were also strictly liable to plaintiffs.

Temporary Condition of Repair
In addition to its claim of third-party fault, Dow argues that a premises owner cannot be strictly liable as a matter of law when the alleged defect occurs during the temporary condition of repair to the premises by an independent contractor. Dow contends that Mr. Hebert's exposure to asbestos-containing products at Dow's Plaquemine facility arose from a condition of maintenance work performed by him while employed by an independent maintenance contractor. Thus, Dow contends, because its duty to maintain its premises free from unreasonable dangers does not extend to the hazards of maintenance work performed on the premises or temporary conditions arising from repair, it is not liable to plaintiffs herein.
While it is true that a temporary condition during repair may not constitute a *503 defect in the premises, this principle does not apply where the flaw or condition is of relative permanence inherent in the thing as one of its qualities. Crane v. Exxon Corporation, U.S A., 613 So.2d 214, 219 (La.App. 1st Cir.1992), writs granted in part on other grounds, 93-0239, 93-0483, 93-0505 (La.7/1/93), 620 So.2d 858; Boudreaux v. Farmer, 604 So.2d 641, 652 n. 10 (La.App. 1st Cir.), writs denied, 605 So.2d 1373, 1374 (La.1992). In the instant case, the record overwhelmingly demonstrates that the unreasonably dangerous asbestos-containing materials were incorporated into Dow's premises and, accordingly, constituted permanent fixtures on the premises. Thus, I believe these arguments lack merit.

ALLEGED NEGLIGENCE OF DOW

(Plaintiffs' Assignment of Error Number 3)
In this assignment of error, plaintiffs contend that the jury was manifestly erroneous in failing to find Dow negligent. They contend that the jury erred in refusing to find Dow negligent "despite a substantial body of evidence of actual and presumed knowledge of the hazards caused by exposure to asbestos."
As stated above, for a plaintiff to recover in strict liability from the owner or custodian of the allegedly defective thing, the plaintiff must prove the vice (i.e., the unreasonable risk of injury to another) in the thing causing the damage and that the damage resulted from this vice. Loescher, 324 So.2d at 447-448. The difference between strict liability and negligence theories is knowledge. Summerville v. Louisiana Nursery Outlet, Inc., 95-2224, p. 3 (La.App. 1st Cir.6/28/96), 676 So.2d 238, 240, writ denied, 96-1921 (La.11/1/96), 681 So.2d 1263. To establish negligence of the premises owner, the plaintiff additionally must prove that the owner knew or should have known of the unreasonable risk of harm posed by the property. Kent v. Gulf States Utilities Co., 418 So.2d at 497.
In support of its contention that Dow knew or should have known of the unreasonable risk of harm posed by its facility, plaintiffs point out that the Plaquemine facility contained miles of asbestos-containing pipe covering and that when Dow eventually implemented its asbestos-abatement program in the 1970s and 1980s, millions of pounds of asbestos-containing materials were removed from the facility. Moreover, plaintiffs further contend that based on the admissions of Harold Hoyle, past director of industrial hygiene affairs at Dow, Dow's knowledge of the hazardous properties of asbestos was clearly established as dating back at least as far as 1948.
Dow, on the other hand, contends that while it had knowledge of certain hazards of asbestos in the 1960s, this knowledge related only to individuals working in asbestos mines and factories where raw asbestos was used. Additionally, Dow contends that mesothelioma was not a foreseeable risk for workers, such as Mr. Hebert, subjected to "bystander exposure" to asbestos-containing products until the mid-1970s. Accordingly, Dow argues, the jury's finding that Dow was not aware that Mr. Hebert's work as a millwright at Dow placed him at an unreasonable risk of contracting mesothelioma was not manifestly erroneous.
Dow asserts that the jury's finding that it was not negligent herein (with the obvious underlying conclusion that Dow did not know nor should it have known of the unreasonable risk of contracting mesothelioma posed by its facility) is entirely consistent with this court's decision in Smith v. Dow Chemical Company, 92-0883, at pp. 7-9 (La.App. 1st Cir.3/28/94), 635 So.2d 325, 330-331, writ granted, 94-1059 *504 (La.6/24/94), 641 So.2d 207.[7] In Smith, this court reviewed the trial court's finding that certain employees and executive officers of Dow were negligent in requiring the plaintiff to work under conditions guaranteed to exceed safe exposure limits to a certain chemical known to cause illness at exposure levels above those limits, where the Dow employees knew of the risk. This court concluded that the trial court committed legal and manifest error in its finding of negligence. Specifically, this court noted that the only harm known to a Dow employee at the time of the plaintiff's exposure was the risk of harm to a different classification of workers from exposure to a different chemical that resulted in an entirely different and unrelated illness. Thus, this court concluded that there was no evidence that the particular illnesses from which the plaintiff suffered were foreseeable risks from exposure to the particular chemical at issue therein that were known to the Dow supervisors and employees. Smith, 92-0883 at pp. 4-9, 635 So.2d at 329-331.
In the instant case, the record establishes that certain Dow employees had knowledge dating back to at least the early 1950s that certain levels of exposure to asbestos could result in injury to the lungs. Contrary to Dow's argument, I do not believe that Smith stands for the proposition that the requisite knowledge in a negligence claim against a premises owner would necessarily be dependent upon actual knowledge of the particular lung injury, i.e., asbestosis versus mesothelioma. Nonetheless, I note that knowledge of the risk of one particular lung injury at a certain level of exposure may not equate to knowledge of a risk of lung injury at a lower level of exposure.
In the case before us, the jury was presented with abundant, yet conflicting, evidence on the issue of Dow's knowledge of the dangers of asbestos. Dr. Arnold Brody, a pathologist specializing in asbestos-related diseases, testified that asbestos was known to cause the lung disease asbestosis (the scarring of the lung from asbestos fibers) in the early 1900s and that asbestos was discovered to be the cause of mesothelioma in 1960. With regard to safe levels of exposure to asbestos, Dr. Brody testified that there is no safe level of exposure to asbestos that would prevent the development of mesothelioma. He explained that even brief exposures to asbestos can cause mesothelioma.
Dr. Victor Roggli, a pathologist who has also specialized in asbestos disease, similarly testified that no level of exposure to asbestos has been identified below which mesothelioma will not occur in humans.
Dr. Richard Lemen, an epidemiologist, past deputy director of the National Institute for Occupational Safety and Health (NIOSH) and past United States Assistant Surgeon General, testified about the history of awareness of asbestos-related diseases. Dr. Lemen similarly explained that the risks to individuals working with asbestos of developing asbestosis were documented in the early 1900s. He opined that by 1930, it was commonly known that asbestosis was caused by asbestos exposure. Additionally, he testified that in the 1930s, recommendations were widely published in industrial publications about methods to prevent the disease by limiting exposure, through adequate ventilation and use of respirators and protective clothing.
According to Dr. Lemen, in 1946, a private organization called the American Conference of Governmental Industrial Hygienists, *505 established the concept of "threshold limit values (TLVs)," which defined an asbestos-exposure limit believed to protect the majority of workers from asbestos disease. However, Dr. Lemen acknowledged that when these TLVs were initially established, they were meant to protect workers from acute toxic effects of asbestos and were not meant to protect against cancer or mesothelioma.
Even prior to the implementation of TLVs by this private organization, the federal government through the United States Public Health Service had recommended a guidance limit in the 1930s, of 5,000,000 particles per cubic foot. When it implemented the concept of TLVs in 1946, the American Conference of Governmental Industrial Hygienists adopted the same guidance limit recommended by the federal government through the United States Public Health Service. This guidance limit was intended to protect the majority of workers from injury, and Dr. Lemen acknowledged that this limit was not changed by the federal government until 1971 or 1972 by the Occupational Safety and Health Administration (OSHA).
Dr. Lemen further testified that, with regard to mesothelioma, the disease itself was described in the late 1930s. However, the first published case reports of workers with this disease occurred in the 1940s. Dr. Lemen opined that by the early 1960s, asbestos exposure was known to cause mesothelioma. However, he further explained that scientists initially thought that the people who were most affected by exposure were those who worked directly with asbestos. Moreover, he acknowledged that in the 1960s, asbestos disease was treated as a disease where dose, or level of exposure, made a difference.
Later, certain studies performed in the 1960s and 1970s indicated that fibers could actually drift away from the area where the material was being applied and affect other workers, a concept labeled "bystander exposure."
With regard to the specific knowledge of Dow and its employees, Dr. Benjamin Holder, an employee in Dow's medical department for over thirty years and its corporate medical director from 1982 to 1985, testified that he first became aware of a causative link between asbestos exposure and mesothelioma in the early 1950s. On the other hand, Harold Hoyle, Dow's first full-time industrial hygienist, testified that, while he was aware of the risk of asbestosis from the time he began working for Dow in 1948, he did not believe that the issue of a causative link between asbestos exposure and mesothelioma was resolved until the early 1970s.
Additionally, Charles Halphen, who was the industrial hygienist at Dow's Plaquemine facility from 1974 to 1986, testified that he did not become aware that asbestos exposure could cause health problems until the 1960s. He further testified that he did not learn that asbestos exposure could cause mesothelioma until 1973 or 1974.
According to Halphen, Dow established baseline exposure levels for every job specification, and it monitored personnel to determine individual exposures to asbestos. However, he acknowledged that, to his knowledge, Dow did not monitor contract personnel on its premises, such as Mr. Hebert.
Charles Melancon, an engineer who worked as a superintendent and manager at the Dow Plaquemine facility during the time Mr. Hebert worked at the facility and who became the safety manager in 1975, testified that he did not become aware that asbestos exposure could cause health problems until the early 1970s.
*506 Dr. Lloyd Balzer, an industrial hygiene engineer called to testify by Dow, opined that in the years 1960 through 1969, industrial hygienists were first discovering the issue of mesothelioma and trying to define it. Thus, from an industrial hygienist's perspective, Dow would not have been able to foresee the hazard of mesothelioma at that time. Additionally, Dr. Balzer further testified that it was not until the mid-1970s when industry began to realize the risk of mesothelioma from bystander exposure to asbestos. Thus, according to Balzer, at the time Mr. Hebert worked at the Dow Plaquemine facility, there was no information available to indicate a risk of contracting mesothelioma from mere bystander exposure.
In sum, based on the record on appeal, the jury was presented with evidence that Dow's knowledge at the time of Mr. Hebert's exposure was limited to knowledge of the risk of lung injury (i.e., asbestosis) above certain exposure levels and that Dow attempted to protect against such risks by attempting to limit exposure at its facilities below those levels. Thus, considering the record as a whole, and the conflicting evidence on the issue of knowledge, I would conclude that there was a reasonable basis in the record to support the jury's obvious determination that Dow did not know nor should it have known of the unreasonable risk of harm presented herein. Accordingly, after careful review of the extensive, conflicting testimony on this issue, I would be unable to conclude that this finding was manifestly erroneous.

FAULT OF THE SETTLING DEFENDANTS

(Plaintiffs' Assignment of Error Number 4; Dow's Assignment of Error Number 3)
In rendering its verdict, with regard to the settling defendants, the jury made specific findings as to the fault of each of those defendants. Dow asserts on appeal that the jury erred in failing to find BASF and Georgia Pacific strictly liable as premises owners. Plaintiffs, on the other hand, argue that the jury erred in finding Kaiser Aluminum Corporation, Garlock, Inc., Johns-Manville Corporation, Armstrong World Industries, Inc. and Flexitallic Gasket Company, Inc. at fault in causing Mr. Hebert's mesothelioma.
A plaintiff's release of a joint tortfeasor reduces the amount recoverable against the remaining tortfeasors by the amount of the virile share (pro rata share) of the one released. Raley v. Carter, 412 So.2d 1045, 1046 (La.1982). Nonetheless, the remaining tortfeasor is only entitled to a reduction of the award if the parties released are proven to be joint tortfeasors. Thus, a pre-trial settlement shifts the burden of proving liability on the part of the released tortfeasors from the plaintiff to the remaining defendant or defendants. Raley, 412 So.2d at 1047.
When evaluating liability in an asbestos claim, traditional theories of tort liability (e.g., negligence, strict premises liability and products liability) apply, which require proof of causation. Emery v. Owens-Corporation, 2000-2144, p. 12 (La.App. 1st Cir.11/9/01), 813 So.2d 441, 452, writ denied, XXXX-XXXX (La.5/10/02), 815 So.2d 842; Summerville, 95-2224 at p. 3, 676 So.2d at 240. Asbestos cases typically involve multiple defendants, and courts have evaluated the cause-in-fact element as to multiple parties, in that, often, more than one defendant substantially contributed to the plaintiff's injury. Quick v. Murphy Oil Co., 93-2267, p. 8 (La.App. 4th Cir.9/20/94), 643 So.2d 1291, 1294, writ denied, (La.1/6/95), 648 So.2d 923; Emery, 2000-2144 at p. 12, 813 So.2d at 452. Where two or more causes are present, the cause-in-fact element is established if the *507 defendant's conduct or fault was a "substantial factor" in bringing about the plaintiff's harm. Quick, p. 10, 643 So.2d at 1295.
Whether a party caused another's injuries is a question of fact subject to the manifest error rule. Emery, 2000-2144 at p. 13, 813 So.2d at 452. Thus, if the jury's findings are reasonable in light of the entire record and are not clearly wrong or manifestly erroneous, they must be affirmed on appeal. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 881-882 (La.1993). Accordingly, as a reviewing court, if there is a reasonable basis in the record to support the jury's findings, we must affirm the findings regarding fault of the settling defendants, i.e., whether the fault of these defendants was a substantial contributing factor of Mr. Hebert's injury, absent a showing of manifest error in these findings.

BASF Wyandotte and Georgia Pacific Corporation
When asked in specific jury interrogatories whether Dow had proven by a preponderance of the evidence that certain premises owners were negligent and such negligence was a substantial contributing cause to Mr. Hebert's asbestos-related injury, the jury responded "No" as to both BASF Wyandotte (BASF) and Georgia Pacific Corporation (Georgia Pacific). The jury similarly found that Dow had failed to prove that these two premises owners had custody and control of a defective condition or thing which created an unreasonable risk of harm to which Mr. Hebert was exposed and that such exposure was a substantial contributing factor to Mr. Hebert's injury.
Dow contends that these findings constituted manifest error, because Mr. Hebert admitted to exposure to asbestos-containing products at these facilities in an answer to interrogatories prior to trial. The interrogatory upon which Dow relies requested that Mr. Hebert provide the names and locations of all jobs, plant sites or vessels on which he had worked which "may have involved contact with, exposure to, or use of any asbestos-containing insulation products" as well as the type, brand name and manufacturer of each such product. (Emphasis added). In response to this interrogatory, Mr. Hebert stated as follows:
From 1953 until 1955, Mr. Hebert worked as a machinist at Kaiser in Baton Rouge. In 1956, he worked at Dow until 1975 as a millwright. He also worked at Hercules Oil, Texaco, Standard Oil and Georgia Pacific as a millwright during the 1970's. While at Standard Oil, Mr. Hebert put in turbines. Mr. Hebert continued his work as a millwright at BASF Wyandotte from 1980 until 1985 and at Ashland from 1988 through 1995.
As a machinist and millwright, Mr. Hebert worked with/or around all crafts, including insulators, pipefitters, boilermakers and electricians using asbestos-containing products during the course of their work. Plaintiff has worked with and/or around the following asbestos containing materials: cement/mud, pipecovering, block, gaskets, cloth, asbestos spray, and packing and thus was exposed to harmful asbestos dust from these products.
At this time, plaintiff cannot recall further details regarding the above noted activities and products, and because discovery in this matter is ongoing, plaintiff reserves the right to supplement and/or amend this response.
Dow contends that Mr. Hebert's "admission" contained in this interrogatory answer "does not separate BASF or Georgia Pacific out as sources of exposure," *508 and, accordingly, the admission establishes that Mr. Hebert was exposed as a millwright at BASF and Georgia Pacific "to harmful dust from these (asbestos containing) products." Dow broadly reasons that "no factual basis existed to distinguish BASF and Georgia Pacific from the group of parties legally responsible for Mr. Hebert's damages." Accordingly, Dow argues, these parties should have also been found strictly liable and assigned a virile share.
Clearly, the answer to the interrogatory as set forth above is insufficient alone to sustain Dow's burden of proving that BASF and Georgia Pacific had custody or control of asbestos-containing products in their facilities that were substantial contributing causes to his asbestos-related injury. Mr. Hebert testified that he "guessed" that he was exposed to asbestos at Georgia Pacific, but could not recall any specific products to which he was allegedly exposed at either of these facilities or the duration or intensity of such exposure. Accordingly, given the lack of evidence of record to establish harmful exposure on the premises of BASF or Georgia Pacific, I would find no manifest error in the jury's findings that these premises owners were neither negligent nor strictly liable herein. See Emery, 2000-2144 at pp. 14-15, 813 So.2d at 453-454; see generally Raley, 412 So.2d at 1048.

Kaiser Aluminum Corporation
The evidence of record demonstrates that Mr. Hebert worked for Kaiser Aluminum as a machinist during the years 1953 to 1956. Mr. Hebert testified that he thought he was exposed to asbestos while he worked at Kaiser, when he handled pump gaskets. He stated that he would have worked with gaskets every time he overhauled a pump or a compressor. When overhauling this equipment, he would remove the old gaskets with a wire brush or an electric grinder. However, he could not provide information as to the manufacturer of the gaskets with which he worked, and, accordingly, it is unclear from the record whether these gaskets actually contained asbestos.
Given the lack of evidence of record to establish harmful exposure on the premises of Kaiser Aluminum, I would conclude that the jury was manifestly erroneous in finding that Kaiser was at fault in substantially contributing to Mr. Hebert's illness.

Garlock, Inc.
Garlock, Inc. manufactured various asbestos-containing gaskets as well as packing material, which were purchased by Dow for use in its Plaquemine facility. Mr. Hebert testified that he used asbestos-containing Garlock packing material, and several Dow employees and contract workers testified that asbestos-containing Garlock products were regularly used at Dow during the time frame in which Mr. Hebert worked at the Plaquemine facility.
As a millwright, Mr. Hebert routinely removed gaskets when performing maintenance work on equipment. He explained that he customarily scraped or chipped the old gaskets off of the equipment and that sometimes they would grind them off, activities which could release fibers into the air.
Accordingly, I would conclude that the record amply supports a finding that Garlock's products substantially contributed to Mr. Hebert's disease. In my opinion, the jury's finding in this regard is not manifestly erroneous.

Johns-Manville Corporation
The record contains ample evidence that Mr. Hebert was exposed to asbestos-containing products manufactured by Johns-Manville Corporation. Mr. Hebert testified he had been exposed to Johns-Manville products in "just about every plant" in *509 which he worked. The record further demonstrates that Dow utilized asbestos-containing insulation and gaskets manufactured by Johns-Manville in its Plaquemine facility while Mr. Hebert worked there. Accordingly, I would likewise conclude that the record amply supports a finding that Johns-Manville's products substantially contributed to Mr. Hebert's disease and that the jury's finding in this regard is not manifestly erroneous.

Armstrong World Industries, Inc.
In his deposition, Mr. Hebert was asked to specifically identify products to which he was exposed from a picture book of asbestos-containing products provided to him by counsel for one of the parties. From that publication, Mr. Hebert identified Armstrong asbestos paper as a product to which he had been exposed. With regard to his exposure to this product, Mr. Hebert stated as follows: "Well, I seen that somewhere too, in some of them plants somewhere, but I don't know exactly what plants it were. Mostly looked like I seen it in just about every plant I went in at one time or another." Mr. Hebert also identified Armstrong gasketing material, stating, "I think I used that.... But I ain't positive on it."
Based on the above, I would conclude that Mr. Hebert's testimony that he may have used Armstrong gaskets was insufficient, in the absence of any corroborating evidence, to establish that this alleged exposure was a substantial contributing cause of his illness. Moreover, with regard to the asbestos paper identified by Mr. Hebert, this product is not listed in the excerpt from the Federal Register introduced at trial by Dow as an asbestos-containing product manufactured by Armstrong. Additionally, there is no information of record to establish when this product may have been manufactured and during which timeframe it may have contained asbestos.
Accordingly, I would conclude that the jury was manifestly erroneous in its finding that Mr. Hebert's alleged exposure to asbestos-containing products manufactured by Armstrong World Industries, Inc. was a substantial contributing cause of his illness.

Flexitallic Gasket Company, Inc.
Mr. Hebert identified several Flexitallic gaskets that he had used during his career. However, he further stated that he was not sure whether the Flexitallic gaskets he used were asbestos gaskets or Teflon gaskets, noting that Flexitallic manufactured both types. Additionally, while the excerpt from the Federal Register does not list Flexitallic as a manufacturer of asbestos-containing gaskets, John Calmes, Sr., a superintendent at Dow's Plaquemine facility during the time Mr. Hebert worked there, confirmed that Dow purchased gaskets from Flexitallic in the 1960s and 1970s that "probably" contained asbestos.
Consequently, I would find no error by the jury in its finding that Mr. Hebert's alleged exposure to asbestos-containing products manufactured by Flexitallic was a substantial contributing cause of his illness.
Because I would conclude that the jury's findings that the products manufactured by Kaiser Aluminum Corporation and Armstrong World Industries, Inc. substantially contributed to Mr. Hebert's illness were manifestly erroneous, I would accordingly make adjustments in the virile share calculation. See Abadie v. Metropolitan Life Insurance Company, 2000-344, pp. 119-120 (La.App. 5th Cir.3/28/01), 784 So.2d 46, 120. Thus, in my opinion, the amended judgment on the merits should be amended to provide that *510 Dow is liable for a one-sixth virile share of the damages awarded to plaintiffs.

GENERAL DAMAGES

(Dow's Assignment of Error Number 4)
The jury awarded Mr. Hebert $2,000,000.00 in general damages. Dow argues that this award is abusively high and should be reduced by this court.
The trier of fact has great, even vast, discretion in assessing general damages, and an appellate court should not modify the award unless it is beyond that which a reasonable trier of fact could assess for a particular injury to the particular plaintiff under the particular circumstances. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Only if the appellate court finds an abuse of that discretion may it examine prior awards of general damages to determine the amount the trier of fact reasonable could award. Theriot v. Allstate Insurance Co., 625 So.2d 1337, 1340 (La. 1993).
The record reveals that Mr. Hebert suffered immense pain and numerous hospitalizations as a result of his disease. Mr. Hebert's medical records indicate that as early as September of 1998, he was experiencing chest pain. An abdominal ultrasound performed several months later, on January 27, 1999, revealed a large right pleural effusion. On February 1, 1999, a CT scan of Mr. Hebert's chest was performed, and on February 9, Mr. Hebert underwent a bronchoscopy. Both of these tests yielded similar findings.
Thereafter, on February 16, 1999, a right thoracotomy with biopsy was performed on Mr. Hebert under general anesthesia to determine the cause of the pleural effusion. The surgeon noted that the parietal and visceral pleura contained "whitish glistening thickened areas" and that the lung was covered with "little satellite lesions." He further noted that areas of Mr. Hebert's chest wall were "just one sheet of this thick pleura shining" with "little ripples" in it. Initial examination of the frozen specimen revealed carcinoma, probable mesothelioma.
The procedure further revealed that Mr. Hebert's right lung was trapped and unable to expand. Thus, the surgeon performed "extensive decortication," or scraping or peeling, to free the trapped lung. During the procedure, the surgeon also drilled four one-eighth inch holes in Mr. Hebert's sixth rib in order to suture the rib to the fifth rib to prevent pressure on the sixth intercostal nerve. Mr. Hebert remained hospitalized after this procedure until February 20, 1999. He continued to suffer a great deal of pain following this procedure, which prevented him from sleeping, and he testified that he had to exceed the prescribed dosage of his pain medication in an attempt to find some measure of relief.
On February 17, 1999, the pathologist who reviewed the biopsy specimen confirmed a diagnosis of mesothelioma. At the time of this diagnosis, Mr. Hebert was sixty-eight years old.
By April of 1999, Mr. Hebert was experiencing "significant difficulty" with chest pain, for which he was prescribed Oxycontin and Roxilox. His oncologist noted decreased breath sounds in the right lung.
On August 30, 1999, Mr. Hebert was hospitalized for severe, intractable pain and nausea and vomiting. He was discharged the following day after receiving IV pain medication.
On October 11, 1999, Mr. Hebert was admitted to the hospital for a trial of morphine administration through an intrathecal catheter, as a method of managing his *511 intractable chest-wall pain. He remained hospitalized for three days, after which he was discharged with instructions to return in one week to have a permanent catheter implanted. The implanted pump was utilized to deliver narcotic pain medication directly into Mr. Hebert's cerebral spinal fluid.
Again during the week before trial of this matter, Mr. Hebert was hospitalized for severe chest pain and associated anxiety. With regard to the pain Mr. Hebert has suffered as a result of this tragic disease, his oncologist testified that he has a "great deal" of pain across his chest and that his life is "severely limited" due to this pain. He noted that as of the time of trial, Mr. Hebert had undergone six nerve blocks as a further attempt to control his pain. Mr. Hebert's oncologist explained that the pain and difficulty Mr. Hebert has experienced continually progresses. He additionally testified that Mr. Hebert's life expectancy as of the time of trial was approximately six months. As noted above, Mr. Hebert died on October 24, 2000.
The emotional toll that this disease had taken on Mr. Hebert was readily apparent from his videotaped deposition, which the jury viewed. The pain he was experiencing severely limited his activity and prevented him from engaging in any hobbies or chores around the house. In essence, Mr. Hebert had been relegated to a life of increasing, debilitating pain with the eventual result being his untimely death. Nonetheless, Dow contends the jury's award was "excessive as a matter of law." Based on the evidence presented, I would conclude that the jury's award, while arguably on the higher end of the spectrum of such awards, was within the factfinders' vast discretion. Accordingly, I would decline to modify the award.

DISMISSAL OF MRS. HEBERT'S CONSORTIUM CLAIM

(Plaintiffs' Assignment of Error Number 2)
In this assignment of error, plaintiffs contend that the trial court erred in granting the motion for summary judgment filed by Dow and dismissing Mrs. Hebert's loss of consortium claim.
In the motion for summary judgment, Dow alleged that Mr. Hebert's last possible exposure to asbestos and the operative facts giving rise to any alleged fault on the part of Dow occurred prior to 1975, and, accordingly, any potential remedy available to Mrs. Hebert should be governed by the law as it existed at the time of Dow's alleged conduct. Dow further argued that, because the remedy for loss of consortium was not created until the 1982 amendment to LSA-C.C. art. 2315, Mrs. Hebert was not entitled to assert this claim.
The trial court agreed with Dow's position, and following a hearing on the motion, it granted the motion for summary judgment and dismissed Mrs. Hebert's claim for loss of consortium.
The core of Dow's argument centers around the fact that the derivative right to recover loss of consortium of a tort victim who had not died from his injuries was not legislative enacted until 1982, through amendment to LSA-C.C. art. 2315.[8] This *512 new cause of action has been deemed to be substantive and, therefore, not retroactive in its nature. Lee v. K-Mart Corporation, 483 So.2d 609, 617 (La.App. 1st Cir. 1985), writ denied, 484 So.2d 661 (La. 1986).
In reviewing the characteristics of a loss of consortium claim in an analogous asbestosis case, our brethren on the Louisiana Fourth Circuit Court of Appeal stated that a cause of action arises when negligent or tortious conduct causes injury. Coates v. Owens-Corning Fiberglas Corporation, 444 So.2d 788, 790 (La.App. 4th Cir.1984); see also McDuffie v. ACandS, Inc., 2000-2745, pp. 2-5 (La.App. 4th Cir.2/14/01), 781 So.2d 623, 624-625. As stated by the court in Coates, "[u]ntil an injured party's condition deteriorates to such an extent that his family is actually deprived of his consortium, service or society, they have suffered no injury." Coates, 444 So.2d at 790. A party's separate cause of action for loss of consortium was thereby deemed to arise as of the time that the injured party begins to suffer the actual loss of consortium. Coates, 444 So.2d at 790-791.
Hence, the time of the exposure or the onset of the injury causing asbestosis is not the determinant in establishing the applicable law governing the separate loss of consortium claim. Rather, it is the loss to the spouse, or relative, of those elements comprising consortium that is the decisive factor. The claim for loss of consortium and the impact of the 1982 amendment to LSA-C.C. art. 2315 should be deciphered independently from the determination of the date on which the cause of action accrued for the disabled spouse.
Applying the aforementioned legal precepts to this case, the record reveals that Mr. Hebert began to experience debilitating symptoms resulting in a diagnosis of mesothelioma in January of 1999. Accordingly, any separate claim for loss of consortium by Mrs. Hebert would have unequivocally arisen well after the legislative amendment to LSA-C.C. art. 2315 to allow for recovery of loss of consortium, service and society. Thus, I would conclude that Mrs. Hebert's loss of consortium claim was viable, and the trial court committed legal error in granting Dow's summary judgment and dismissing this claim.
On appeal, plaintiffs have requested that this court remand the matter to the trial court for trial of Mrs. Hebert's loss of consortium claim. When an appellate court has all the facts before it, the trial court's legal error does not warrant remand. Rather, the appellate court should review the record de novo and render judgment of the merits. See Gonzales v. Xerox Corporation, 320 So.2d 163, 165-166 (La.1975); Noveh v. Broadway, Inc., 95-2081, p. 6 (La.App. 1st Cir.5/10/96), 673 So.2d 349, 353, writ denied, 96-1431 (La.9/13/96), 679 So.2d 109.
In the instant case, Mr. and Mrs. Hebert had been married for forty-six years. They had six children and fifteen grandchildren. Mrs. Hebert related that upon her husband's diagnosis, she was devastated, scared and anxious and that she cried often. While Mr. Hebert had been very actively involved with his family prior to his diagnosis, his condition had rendered him unable to perform most activities. He was no longer able to assist Mrs. Hebert around the house, and his illness clearly interfered with the parties' sexual relationship.
Accordingly, based on the record on appeal, I would find the record supports *513 an award to Mrs. Hebert of the sum of $125,000.00 for loss of consortium.[9]

CONCLUSION
For the above reasons, while I agree with the majority's conclusion that the November 8, 1999 judgment, maintaining the exceptions of lack of personal jurisdiction filed by Harold Hoyle, Benjamin Holder and Harold Gordon should be affirmed, I respectfully disagree with the majority's decision to vacate the March 13, 2000 amending judgment in favor of plaintiffs on the merits and to remand for further proceedings. Instead, I would amend the March 13, 2000 amending judgment on the merits to reflect that Dow is liable for a 1/6 virile share, rather than a 1/8 virile share, rendering it liable to plaintiffs in the amount of $354,166.66 (1/6 of the jury's award as amended by the trial court to reduce the award of medical expenses from $500,000.00 to $125,000.00).
Additionally, with regard to the judgment of the trial court rendered October 25, 1999, and signed July 25, 2000, granting Dow's motion for summary judgment and dismissing Mrs. Hebert's loss of consortium claim, I would reverse that judgment and render judgment on the loss of consortium claim in favor of plaintiff, Marion Hebert, and against Dow in the amount of $20,833.33 (1/6 of the award of $125,000.00 for loss of consortium).
Accordingly, I respectfully concur in part and dissent in part.
NOTES
[1] Mr. Hebert died during the pendency of this appeal. Accordingly, by order dated October 29, 2001, this court granted the motion to substitute parties, substituting Marion D. Hebert, Alvin A. Hebert, Jr., Stanley Robert Hebert, Cindy Hebert Himel, Nancy Hebert Villerette, Catherine Hebert Harelson and Blake J. Hebert, the surviving spouse and children of decedent, as plaintiffs in lieu of Mr. Hebert.
[2] In their original and amended petitions, plaintiffs named a total of thirty-eight defendants.
[3] Although Dow contends in its brief on appeal that it had no notice of the parties with whom plaintiffs had settled until the morning of trial, we note that Dow acknowledged at the beginning of the trial that it had received an amended list of settling defendants four days prior to the commencement of trial. (Thus, it is apparent Dow had received a list of settling defendants, albeit incomplete, even prior to that.) Accordingly, absent any showing of undue duress or restriction by the trial court, we find Dow was not relieved of the obligation to timely amend its pleadings to assert any affirmative defense it wished to raise regarding extinguishment of the debt on the basis of plaintiffs' settlements with a manufacturing defendant.

Additionally, we find no merit to Dow's assertion that it properly raised this affirmative defense in its answer simply by pleading that plaintiffs' injuries were caused by the sole fault of others or by averring that any award to plaintiffs should be reduced to the extent of any settlement or releases of any persons or entities. In sum, reduction by pro rata virile shares on the basis of settlement with a solidary coobligor is an entirely separate defense than extinguishment of the debt in favor of the alleged secondary or derivative obligor by virtue of settlement with the alleged primary obligor.
[4] Although Dow similarly did not amend to specifically plead extinguishment of the debt on this particular basis either, both sides presented argument at the beginning of trial on this issue with regard to a subpoena duces tecum served on plaintiffs. Accordingly, we shall address the merits of Dow's argument herein.
[5] Prior to 1979, and the amendment to La. C.C. art. 2324, the provisions of La. C.C. art. 2103 stated in pertinent part: "As between the solidary debtors, each is liable only for his virile portion of the obligation." (Emphasis added.) "Virile portion" was interpreted as "equal" portion. Efferson v. State, 463 So.2d 1342, 1352-1353. Negligence was not graded by degrees of fault. See Comparative Fault & Solidary Delictual Obligations: On Further Consideration, 60 Louisiana Law Review 513, 531.
[6] Acts 1984, No. 331, eff. January 1, 1985.
[7] Former La. C.C. art. 2203 provided:

The remission or conventional discharge in favor of one of the debtors in solido discharges all the others, unless the creditor has expressly reserved his right against the latter.
In the latter case, he cannot claim the debt without making a deduction of the part of him to whom he has made the remission.
[1] Although Dow similarly did not amend to specifically plead extinguishment of the debt on this particular basis either, both sides presented argument at the beginning of trial on this issue with regard to a subpoena duces tecum served on plaintiffs. Accordingly, I would address the merits of Dow's argument herein.
[2] While Dow was unable to state with certainty at oral argument on appeal whether or not an inspection had occurred, plaintiffs' counsel affirmatively maintained that the documents had been furnished to the trial court and thereafter returned to plaintiffs at the conclusion of trial.
[3] Following argument of this matter before the five-judge panel, this court requested that the parties submit additional briefs to clarify certain issues.
[4] With regard to a long-latency occupational disease claim, the law in effect at the time of exposure applies. See Cole v. Celotex Corporation, 599 So.2d 1058, 1066 (La.1992). Thus, the limitations imposed upon strict premises liability set forth in LSA-C.C. art. 2317.1, added by Acts 1996, 1st Ex.Sess., No. 1, § 1, are not applicable herein.
[5] In Hunt, both the custodian and the manufacturer of the escalator were found to have knowledge of the hazard. Hunt, 387 So.2d at 588, 589. Thus, the elements for both negligence and strict liability theories presumably were present.
[6] Even if persuaded by the Third Circuit's holding in Jowers, I note that Jowers is factually distinguishable from the present case. In Jowers, the manufacturer, whose third-party fault was found to be a defense to the fault of the premises owners, was found to be both negligent and strictly liable, based upon its failure to warn of a known risk. Moreover, the homeowner was found to be a do-it-yourself homeowner with no knowledge of the dangerous propensities of wet cement. Jowers, 435 So.2d at 578-579. In the instant case, both Dow and the manufacturing defendants were found to be at fault solely on the basis of strict liability, with no independent negligence. Moreover, while the jury may not have found that Dow had sufficient knowledge of the unreasonably dangerous condition of its premises to render it negligent, Dow clearly had some knowledge of potential hazards of asbestos exposure and, accordingly, was not the type of uninformed, unsuspecting premises owner as was the homeowner in Jowers.
[7] While the Supreme Court granted the plaintiff's writ application in Smith, there is no further reported disposition by the Court on the case.
[8] As amended in 1982, LSA-C.C. art. 2315 provides as follows:

Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.
Damages may include loss of consortium, service, and society, and shall be recoverable by the same respective categories of persons who would have had a cause of action for wrongful death of an injured person.
Article 2315 was again amended in 1999, to add language detailing certain items which are not recoverable as damages. The 1999 amendments were specifically declared to apply to all "claims existing or actions filed on its effective date," July 9, 1999.
[9] Plaintiffs have requested that this court remand this matter for trial on the loss of consortium claim. Prior to trial of this matter, Dow filed a motion in limine, seeking to exclude "any evidence regarding any familial relationships of Alvin Hebert because no consortium or relational interests are at issue in this suit." While the record does not reveal a ruling on that motion, I note that Mrs. Hebert's testimony at trial was very brief. However, I would again conclude that if there was additional evidence that plaintiffs deemed relevant to this issue, it was plaintiffs' duty to proffer such evidence in the event the trial court limited the testimony in this regard.