**AFFIRMED IN PART, VACATED, AND REMANDED WITH INSTRUCTIONS.**

**Da'Shawn S. VERRETT**

v.

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA and Strategic Restaurants Acquisition Company, L.L.C. d/b/a Burger King Restaurant No. 11614**

NO. 16–CA–229

Court of Appeal of Louisiana, Fifth Circuit.

December 07, 2016

COUNSEL FOR PLAINTIFF/APPEL-
LANT, DA'SHAWN S. VERRETT, Rob-
ert M. Hearin, Jr.

COUNSEL FOR DEFENDANT/AP-
PELLEE, NATIONAL UNION FIRE
INSURANCE COMPANY OF PITTS-
BURGH, PA AND STRATEGIC RES-
TAURANTS ACQUISITION COMPANY,
L.L.C. D/B/A BURGER KING RESTAU-

RANT NO. 11614, Christian B. Bogart, Meredith L. Simoneaux

Panel composed of Susan M. Chehardy, Jude G. Gravois, and Stephen J. Windhorst

CHEHARDY, C.J.

Plaintiff, Da'Shawn Verrett, appeals the 24th Judicial District Court's January 4, 2016 judgment granting summary judgment in favor of defendant, Strategic Restaurants Acquisition Company, LLC d/b/a Burger King Restaurant No. 11614 ("Burger King"), dismissing all but one of Ms. Verrett's claims against Burger King. For the reasons that follow, we affirm this judgment of the district court.

## FACTS AND PROCEDURAL HISTORY

It was early Sunday morning when Da'Shawn Verrett stopped to pick up breakfast on her way to church. She pulled into the drive-thru lane at Burger King around 8:00 a.m. on August 4, 2013. She ordered a ham, egg, and cheese Croissan'wich with a 22–ounce Sprite. As she began to enjoy her meal she noticed that her Sprite had a funny taste. She peeled back the plastic lid of the cup to discover a live insect "swimming" in the soda secreting "black and brownish looking stuff." This insect was later identified as a "broad-headed bug," *Ezperanza texana* of the *Alydidae* family: a flying insect that feeds on Bermuda grass and is common in this area.

Ms. Verrett immediately "began feeling sick to [her] stomach." Nauseous, she attended church, and then a graduation party, where she tried to eat some food, but vomited several times. She continued to experience nausea, vomiting, and sweating throughout the day, and so reported to the emergency room at West Jefferson Medical Center later that night. All tests came back normal. Most notably, the examination of her abdomen and gastrointestinal system came back normal. Having determined that Ms. Verrett was "in stable condition with no emergent medical condition," she was prescribed anti-nausea medicine, discharged, and instructed to follow up with her primary care physician.

Two days later she met with Dr. Carlos Trujillo, who also prescribed her anti-nausea medicine. But Ms. Verrett continued to experience nausea, stomach pain, vomiting, and diarrhea. She soon had trouble sleeping and was becoming more anxious. Recognizing that the incident had caused Ms. Verret "psychological trauma," which in turn "exacerbated her symptoms," Dr. Trujillo recommended that she seek psychological treatment. In September 2013, Ms. Verrett participated in several psychotherapy sessions while Dr. Trujillo continued to treat her.

Ms. Verrett's symptoms of nausea, vomiting, diarrhea, lack of sleep, and anxiety persisted, which eventually resulted in Ms. Verrett missing work and school.[1] Her absence from school resulted in poorer grades and a lower G.P.A., for which she was placed on academic probation, which in turn negatively affected her financial aid.

In April 2014, Dr. Trujillo referred Ms. Verrett to a gastroenterologist for further treatment. On May 20, 2014, Dr. Tamer Acikalin performed an esophagogastroduodenoscopy (EGD), in which he examined Ms. Verrett's esophagus, stomach, and duodenum and determined all were normal. Dr. Acikalin also performed a gastric biopsy, which revealed the presence of

---

1. Ms. Verrett was enrolled as a student at Xavier University and worked several part-time jobs.

*Helicobacter pylori*, a bacterium present in about half of the world's population. This bacterium is usually contracted in early childhood and persists through adulthood if left untreated. The major, if not exclusive, mode of transmission is person-to-person contact.

Dr. Trujillo believed it was "more likely than not that [this] bacterium was present in Ms. Verrett's digestive system prior to August 4, 2013." Similarly, Dr. F. Brobson Lutz, an epidemiologist and Burger King's retained medical expert, attested that "[t]here are no clinical, laboratory, or epidemiologic data to support Ms. Verrett's contention that she contracted [this bacterium] from drinking [the] Sprite."

Moreover, there was no medical evidence to suggest that Ms. Verrett's symptoms were caused by the *Helicobacter pylori* bacterium. Rather, it was Dr. Trujillo's medical opinion that "[t]he onset of Ms. Verrett's symptoms…[was] the result of her observing the live bug…swimming in her soft drink beverage, and of her consciously being aware that she had ingested up to half of the Sprite prior to discovering the bug." Dr. Trujillo further opined that "the psychological trauma caused from her observing the bug in her beverage…exacerbated Ms. Verrett's anxiety and caused her to experience the continued and persistent symptoms of nausea, retching, and vomiting, along with abdominal pain and stomach upset, and, by way of the gastrological consults, led to the discovery of the *Helicobacter pylori* bacterium as being present in her stomach."

On July 31, 2014, Ms. Verrett filed suit against Burger King and its insurer[2] seeking damages for the physical and emotional distress she sustained as a result of ingesting the Sprite. On July 9, 2015, Burger King filed a motion for summary judgment arguing it was entitled to judgment as a matter of law because, on the undisputed facts, Ms. Verrett could not prove the necessary element of causation, *i.e.*, that her ingestion of the Sprite had caused her injuries.

After obtaining a continuance of the hearing on Burger King's motion for summary judgment to conduct further discovery, Ms. Verrett amended her petition on December 4, 2015, in which she added defendants Ecolab, Inc., the pest control company servicing the Burger King in question, and Robert Uzee, the Ecolab employee who provided these pest control services. She also added other delictual causes of action based on theories of premises liability under La. C.C. arts. 2317, 2317.1, and 2322, and La. R.S. 9:2800.6, as well as a cause of action in redhibition under La. C.C. art. 2520.

In light of her amended petition, Ms. Verrett moved to continue the hearing on the motion for summary judgment so as to permit an opportunity for the new defendants to be served and file responsive pleadings. At the hearing on December 15, 2015, the court denied this motion in open court, noting that if Ms. Verrett could not prove the necessary element of causation, it made no difference whether the new defendants were added. Counsel for Ms. Verrett even agreed with this assessment: "…if you were to grant the summary judgment, I would agree with you." The hearing on Burger King's motion for summary judgment proceeded and, following argument, the court granted the motion, explaining: "There is no proof that the food was deleterious. The bug itself wasn't

---

**2.** Ms. Verrett later voluntarily dismissed the insurer from the suit pursuant to La. C.C.P. art. 1671.

ingested." The court also noted the evidence indicated that the *Helicobacter pylori* bacterium was present in Ms. Verrett's digestive system prior to August 4, 2013 and Dr. Trujillo's medical opinion that psychological trauma was the cause of Ms. Verrett's injuries. The court further pointed out that it was unable to find a "case in Louisiana where a restaurant has the duty to protect the consumer from emotional distress to her own negative perceptions."

In its written judgment that followed on January 4, 2016, the court granted the motion for summary judgment and dismissed with prejudice Ms. Verrett's claims against Burger King except for her claim in redhibition. The court designated this partial judgment as final in accordance with La. C.C.P. art. 1915(B)(1). Ms. Verrett timely moved for a devolutive appeal.

**DISCUSSION**

On appeal, Ms. Verrett assigns two errors: (1) the district court erred in granting Burger King's motion for summary judgment; (2) and the district court erred in denying Ms. Verrett's motion to continue the hearing on Burger King's motion for summary judgment.[3]

*Assignment of Error One*

In Ms. Verrett's first assignment of error, she argues that the district court erred in granting Burger King's motion for summary judgment because three significant material facts remain in dispute.

Appellate courts review a judgment granting a motion for summary judgment *de novo*. *Richthofen v. Medina*, 14–294 (La.App. 5 Cir. 10/29/14), 164 So.3d 231, 234, *writ denied*, 14–2514 (La. 3/13/15), 161 So.3d 639. Thus, this Court uses the same criteria as the trial court in determining whether summary judgment is appropriate. *Id.* Summary judgment is appropriate when there remains no genuine issue as to material fact and the mover is entitled to judgment as a matter of law. *Id.* at 233. In other words, when all the relevant facts are marshalled before the court, the marshalled facts are undisputed, and the only issue is the ultimate conclusion to be drawn from those facts, summary judgment is proper. *Id.* at 234.

Ms. Verrett contends three significant material facts remain in dispute: (1) whether the insect rendered the food deleterious; (2) the cause of her injuries; and (3) the incubation period for food-borne illness.

Our review of the record in this case confirms that none of these facts are in dispute. First, none of the medical evidence indicates that Ms. Verrett was exposed to a deleterious substance. The tests performed in the emergency room, as well as those performed by Dr. Trujillo and Dr. Acikalin all came back normal. Plus, the unrebutted evidence indicates that the *Helicobacter pylori* bacterium was present in Ms. Verrett's system prior to August 4, 2013.

Second, all the evidence on the issue of causation establishes that Ms. Verrett's symptoms were not caused by her consumption of the Sprite. Dr. Trujillo stated: "The onset of Ms. Verrett's symptoms...[was] the result of her observing the live bug...swimming in her soft drink beverage, and of her consciously being aware that she had ingested up to half of the Sprite prior to discovering the bug."

---

**3.** Although Ms. Verrett assigns four errors in her brief to this Court, the first two "assignments" are arguments relating to the district court's ruling granting summary judgment in favor of Burger King, and the latter two are arguments relating to the district court's ruling denying her motion for a continuance. This opinion considers Ms. Verrett's arguments relating to the summary judgment ruling under the first assignment of error, and her arguments relating to the continuance ruling under the second.

Similarly, Dr. Lutz stated: "It is my opinion that Ms. Verrett's acute onset of nausea, vomiting, diarrhea, stomach pains, and subsequent diagnosis of Helicobacter was not caused by the Sprite she ingested from Burger King on August 4, 2013."

And third, the only evidence regarding the incubation period of food-borne illness was offered by Dr. Lutz, who attested:

> For food-borne infections, the incubation period is the time from eating a contaminated food to the onset of symptoms. [Ms.] Verrett testified that she felt nauseous immediately after seeing the bug in her drink and vomited within a few hours. Such a brief incubation period as Ms. Verrett identified does not fit any medically recognized incubation period for food-borne illness. Her onset of nausea and vomiting within hours of drinking the Sprite from Burger King makes it extremely unlikely that the Burger King Sprite caused the nausea and vomiting because the incubation period for most food-borne illness is not simply a few hours, but rather a much longer period of time, more likely a day or two.

In support of her position that the incubation period for food-borne illness remains a disputed fact, Ms. Verrett points to expert testimony offered in other cases on this subject, namely, *Anderson v. Piccadilly Cafeteria, Inc.*, 00–1666 (La.App. 1 Cir. 9/28/01), 804 So.2d 75, 77 ("the incubation period for food bacteria is at least one hour, usually much longer") and *Hairston v. Burger King Corp.*, 33,587 (La.App. 2 Cir. 6/21/00), 764 So.2d 176, 177 ("the incubation for different types of bacteria which can cause food poisoning is anywhere from an hour to a week").

Expert testimony offered in other cases does not qualify as and is not properly considered as evidence in this case. The only evidence offered in this case on the issue of the incubation period for a food-

borne illness is Dr. Lutz's undisputed testimony.

Because we find there are no genuine issues of material fact, our inquiry is whether under these undisputed facts Burger King is entitled to judgment as a matter of law. The district court ruled Burger King was so entitled with respect to Ms. Verrett's action in negligence.

■ The Louisiana Supreme Court has held that the duty-risk analysis in negligence claims governs deleterious food cases. *See Porteous v. St. Ann's Cafe & Deli*, 97–0837 (La. 5/29/98), 713 So.2d 454, 455. To succeed on a claim of negligence, the plaintiff must prove five elements: (1) proof that the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) proof that the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) proof that the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) proof that the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability, scope of protection, scope of duty element); and (5) proof of actual damages (the damages element). *See Rando v. Anco Insulations Inc.*, 08–1163 (La. 5/22/09), 16 So.3d 1065, 1086.

Here, the district court granted summary judgment in favor of Burger King and dismissed Ms. Verrett's negligence claim on the basis that she could not prove the third and fourth elements.

■ Under the third element, the cause-in-fact element, the plaintiff must prove the existence of a causal relationship between the injury and the consumption of the food. *See Landreneau v. Copeland's Cheese Cake Bistro, L.L.C.*, 08–647 (La. App. 5 Cir. 1/13/09), 7 So.3d 703, 706. This requires the plaintiff to show that it is

more likely than not that the food's deleterious condition caused the injury. *Id.* In satisfying this burden of proof, the plaintiff need not produce an actual analysis of the food consumed in order to establish its deleterious condition. *Id.* Rather, the deleterious condition of the food may be inferred from the circumstances surrounding the injury. *Id.* For instance, in cases in which there has been successful recovery, the plaintiff has shown that the food was consumed by him, and that no other food which might reasonably be assumed to have caused the illness had been consumed within a number of hours before or after the consumption of the suspect product. *Id.* The successful plaintiff has also had medical opinion to the effect that it was probable that his illness was caused by the consumption of the particular product involved. *Id.*

In proving that deleterious food caused injuries, Louisiana courts have generally required actual consumption, *i.e.,* ingestion, of the alleged deleterious food. For instance, the Second Circuit has denied recovery to plaintiffs whose injuries resulted only from their observation of tainted food. In *Craig v. Albertson's Southco, Inc.,* 415 So.2d 237, 238 (La. App. 2 Cir. 1982), the plaintiffs discovered a worm in the can of corn they intended to serve at a dinner party. They sued the manufacturer under theories of breach of warranty and negligence seeking damages for emotional and physical distress (nausea). *Id.* The district court sustained the manufacturer's exception of no cause of action on the basis that the jurisprudence requires the injury be caused by consumption. *Id.* The Second Circuit affirmed, holding that "[t]he implied warranty of fitness in such cases is designed to protect consumers from consuming food products containing deleterious substances and is not intended to protect against injuries caused by the mere observation of such substances." *Id.*

On the other hand, in an anomalous case, the Fourth Circuit expanded the requirement of actual consumption to include inhalation of odors emanating from deleterious food. In *Prejean v. Great Atl. & Pac. Tea Co.,* 457 So.2d 60, 61 (La. App. 4 Cir. 1984), the plaintiff purchased a roast from the defendant grocery store for Easter dinner the next day. Although the meat appeared pink through the cellophane wrap when it was purchased, when the plaintiff unwrapped it the next morning, the bottom of the roast was as "green as grass." *Id.* The odor made her gag and nauseous, but she did not vomit. *Id.* After obtaining a refund for the roast, the plaintiff began vomiting and later vomited blood. *Id.* She reported to the hospital where she was diagnosed with a Mallory–Weiss tear in her esophagus caused by forceful vomiting. *Id.* She filed suit against the grocery store, and the trial court issued judgment in favor of the defendant, finding its liability is limited to injuries sustained as a result of consuming deleterious food. *Id.* Because the plaintiff's injuries were sustained only by the "sight and smell" of the spoiled roast, she could not recover. *Id.*

On appeal, the Fourth Circuit reversed. The court found there was no statutory basis for requiring consumption as a necessary condition for recovery. *Prejean, supra* at 62. Nevertheless, the court found that even if a bodily contact requirement were to be read into the statute, "inhalation of noxious, poisonous gases from putrid meat is no different or less dangerous than swallowing the meat." *Id.* The court concluded that the plaintiff was entitled to recover damages for the Mallory–Weiss tear she sustained as a result of the forceful vomiting caused by the sight and smell of the rotten roast. *Id.* at 63.

∎ Under the undisputed facts of the present case, we find that Ms. Verrett

cannot prove that consumption of deleterious food caused her injuries. First, if we accept, as the district court seemed to,[4] that the insect itself is the deleterious condition of the Sprite, it follows that there is no evidence to establish that Ms. Verrett consumed deleterious food because she did not swallow the insect itself. Second, if we are to assume that the alleged "black and brownish" discharge from the insect rendered the Sprite deleterious, Ms. Verrett still cannot satisfy the cause-in-fact element because there is no evidence to support the conclusion that her ingestion of this alleged substance caused her injuries.

Neither Ms. Verrett's treatment in the emergency room nor her subsequent treatments by Dr. Trujillo and Dr. Acikalin indicated that she had ingested any substance responsible for her symptoms. In fact, Dr. Trujillo, Ms. Verrett's own physician, attested that her injuries were the result of her observing the live insect in her drink while being aware that she had ingested the drink prior to discovering the insect. In other words, if Ms. Verrett had consumed the Sprite without ever opening the lid, it follows from Dr. Trujillo's opinion that she would not have experienced the injuries for which she now seeks redress. From this it is apparent that it was not a deleterious condition of the food that caused Ms. Verrett's injuries, but her knowledge that she had consumed a drink that contained an insect.

■ Unable to satisfy the cause-in-fact element, we find Ms. Verrett also cannot satisfy the scope of duty element. She cannot establish that the protection afforded by Burger King's duty to its customers encompasses protecting her from harm caused by her knowledge that she consumed a drink containing an insect. Under the scope of duty element, the plaintiff must prove that the injury was within the scope of the protection afforded by the duty that is alleged to have been breached. *See Rando v. Anco Insulations Inc., supra* at 1086. This is ultimately a question of policy that requires determining whether the duty extends to or is intended to protect this plaintiff from this type of harm arising in this manner. *See Am. Rebel Arms, L.L.C. v. New Orleans Hamburger & Seafood Co.,* 15–599 (La. App. 5 Cir. 2/24/16), 186 So.3d 1220, 1222. While this inquiry is purely a legal question, it depends on such factual determinations as foreseeability and ease of association. *Id.* For instance, a risk may not be within the scope of a duty where the circumstances of the particular injury to the plaintiff could not be reasonably foreseen or anticipated, because there was no ease of association between that risk and the legal duty. *Id.* at 1222–23. The extent of protection owed by a defendant to a plaintiff is made on a case-by-case basis to avoid making a defendant an insurer of all persons against all harms. *Id.* at 1223.

■ Commercial restaurants have a duty to serve food free of injurious substances. *Porteous, supra* at 457. "[A] food provider, in selecting, preparing and cooking food, including the removal of injurious substances, has a duty to act as would a reasonably prudent man skilled in the culinary art in the selection and preparation of food." *Id.* In this case, we are asked to determine whether the protection afforded by this duty extends to protect consumers from injuries caused by their emotional responses to their consumption of non-deleterious food.

The First Circuit has held that it does not. In *Anderson v. Piccadilly Cafeteria, Inc., supra* at 76, the plaintiff became violently ill within minutes of consuming a

---

4. At the December 15, 2015 hearing, the court stated: "There is no proof that the food was deleterious. The bug itself wasn't ingested."

discolored fruit salad at a Piccadilly Cafeteria. Subsequently diagnosed with a Mallory–Weiss tear in her esophagus caused by severe vomiting, the plaintiff sued Piccadilly alleging negligence and breach of warranty. *Id.* The matter proceeded to trial and the court rendered judgment in favor of the plaintiff, finding that she had suffered a " 'vagal response'[5] to the noxious condition of the fruit salad." *Id.* In its reasons for judgment, the trial court explained that " 'the fruit salad was in a deleterious condition and that the taste, smell, and discolored state of the fruit salad caused the injuries and damages sustained by [the plaintiff].' " *Id.* at 76–77.

On appeal, the First Circuit reversed. Noting that the evidence established the incubation period for food-borne illness is at least one hour, but usually much longer, and that there was no medical evidence to indicate that the plaintiff had been exposed to bacterial poisoning, the appellate court determined that the trial court manifestly erred in finding that "the fruit salad was deleterious." *Piccadilly* |₁₂at 77. Rather, "[t]he evidence in this case shows nothing more than plaintiff's mere *perception* that the food was contaminated." *Id.* (Emphasis original). The court explained:

> Common knowledge and experience tell us that different people will react differently to the appearance, taste or smell of different foods, whether wholesome or contaminated. But Louisiana courts have never held such an emotional response as the basis for liability without proof that the food was in fact deleterious. The restaurant has no duty to protect the consumer from an emotional response to her own negative perceptions.

*Id.* at 77–78.

Finding that the plaintiff's injuries were outside the scope of protection of Piccadil-

ly's duty, the court held that the trial court erred as a matter of law in granting judgment in favor of the plaintiff. *Id.* at 78.

 We agree with the First Circuit that as a matter of policy, and practicality, the protection afforded by a restaurant's duty to its customers cannot extend to protect customers from harm caused by the customers' subjective perceptions of non-deleterious food. A defendant's scope of duty, and hence liability, extends so far as the harm sustained by the plaintiff is a reasonably foreseeable result of the breach of the defendant's duty. *See Am. Rebel Arms, supra* at 1223–24. To foresee harms like the one in this case would require a restaurant to learn each individual customer's personal expectations, sensitivities, and tolerances. This is neither practical nor reasonable. A slimy tomato or wilted lettuce may repulse one person, while another may consume it without a second thought. Absent proof that the food was deleterious and caused the plaintiff's injuries, a restaurant's duty to its customers does not protect them from harm caused by their own subjective perceptions of the food. Accordingly, we find that the protection afforded by Burger King's duty to its customers does not extend to protect Ms. Verrett from harm caused by her revulsion at the thought that she had consumed a drink that contained an insect.

|₁₃Under the undisputed facts of this case, we conclude that Ms. Verrett can neither prove the cause-in-fact nor scope of duty elements of her negligence claim, and, therefore, that Burger King is entitled to judgment as a matter of law. The district court properly granted summary judgment in favor of Burger King.

---

**5.** According to the plaintiff's treating physician, " 'anything that's perceived as being exceptionally noxious can actually stimulate the vagal nerve ... and can cause either diarrhea or vomiting.' " *Piccadilly,* 804 So.2d at 77.

This assignment of error is without merit.

### Assignment of Error Two

■ In Ms. Verrett's second assignment of error, she argues that the district court erred in denying her request for a continuance in light of her supplemental and amending petition, in which she added new defendants and raised new causes of action. She contends that the district court should have granted the continuance to consider these new claims and parties before granting summary judgment.

■ A trial court has great discretion in granting or denying a motion for a continuance under La. C.C.P. art. 1601, and that discretion will not be disturbed on appeal in the absence of clear abuse of discretion. *Suarez v. Acosta,* 15-750 (La. App. 5 Cir. 3/16/16), 194 So.3d 626.

■ In her supplemental and amending petition, Ms. Verett asserted new causes of action in premises liability and redhibition. All delictual actions, including actions in premises liability, require proof of causation. *See Hebert v. A NCO Insulation Inc.,* 00–1929 (La.App. 1 Cir. 7/31/02), 835 So.2d 483, 506, *writs denied,* 02–2956, 02–2959 (La. 2/21/03), 837 So.3d 629. As the district court found, because Ms. Verrett cannot prove that her injuries were caused by her consumption of the Sprite, she likewise cannot succeed on her various claims of premises liability. Accordingly, the court's denial of the continuance did not prejudice Ms. Verrett with respect to these meritless claims. With respect to her claim in redhibition, this claim was excepted from the district court's granting of summary judgment, and is still pending. For this reason, the court's denial of the continuance did not prejudice Ms. Verrett's claim in redhibition.

As to the new defendants added in her amended petition, we find, as the district court noted and to which counsel for Ms. Verrett even agreed, that absent proof of causation, the addition of new defendants is of no consequence. Here too, the court's denial of the continuance did not prejudice Ms. Verrett.

We conclude that the district court did not abuse its discretion in denying Ms. Verrett's request for a continuance. This assignment of error is without merit.

### DECREE

For the foregoing reasons, we affirm the January 4, 2016 judgment of the district court.

**AFFIRMED**